1

2

3

4

5        UNITED STATES DISTRICT COURT

6        EASTERN DISTRICT OF CALIFORNIA

7

8    TREVOR WEEKS,                              CASE NO. 1:13-CV-1641 AWI JLT

9              Plaintiff
                                                ORDER ON DEFENDANT'S MOTION
10           v.                                 FOR SUMMARY JUDGMENT

11   UNION PACIFIC RAILROAD CO.,
                                                (Doc. No. 25)
12             Defendant

13

14

15           This is an employment discrimination case brought by Plaintiff Trevor Weeks ("Weeks")

16   against his current employer, Defendant Union Pacific Railroad ("Union Pacific").  Weeks alleges

17   causes of action for disability discrimination under 42 U.S.C. § 12112 (the Americans with

18   Disabilities Act) ("ADA") and state law for disability discrimination under Government Code §

19   12940 (the California Fair Employment and Housing Act) ("FEHA"), retaliation for taking

20   medical leave under Government Code § 12945.2 (the California Family Rights Act ("CFRA")),

21   and retaliation under California Labor Code § 923.  Union Pacific now moves for summary

22   judgment on all claims alleged against it.  For the reasons that follow, the motion will be granted

23   in part and denied in part.

24

25                          **SUMMARY JUDGMENT FRAMEWORK**

26           Summary judgment is proper when it is demonstrated that there exists no genuine issue as

27   to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

28   Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-

1   <u>Cinema, Inc.</u>, 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears

2   the initial burden of informing the court of the basis for its motion and of identifying the portions

3   of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine

4   issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Soremekun v. Thrifty</u>

5   <u>Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome

6   of the suit under the governing law.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49

7   (1986); <u>United States v. Kapp</u>, 564 F.3d 1103, 1114 (9th Cir. 2009).  A dispute is "genuine" as to

8   a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-

9   moving party.  <u>Anderson</u>, 477 U.S. at 248; <u>Freecycle Sunnyvale v. Freecycle Network</u>, 626 F.3d

10  509, 514 (9th Cir. 2010).

11          Where the moving party will have the burden of proof on an issue at trial, the movant must

12  affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.

13  <u>Soremekun</u>, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an

14  issue at trial, the movant may prevail by presenting evidence that negates an essential element of

15  the non-moving party's claim or by merely pointing out that there is an absence of evidence to

16  support an essential element of the non-moving party's claim.  <u>See</u> <u>James River Ins. Co. v. Herbert</u>

17  <u>Schenk, P.C.</u>, 523 F.3d 915, 923 (9th Cir. 2008); <u>Soremekun</u>, 509 F.3d at 984.  If a moving party

18  fails to carry its burden of production, then "the non-moving party has no obligation to produce

19  anything, even if the non-moving party would have the ultimate burden of persuasion."  <u>Nissan</u>

20  <u>Fire & Marine Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If the moving party

21  meets its initial burden, the burden then shifts to the opposing party to establish that a genuine

22  issue as to any material fact actually exists.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>

23  <u>Corp.</u>, 475 U.S. 574, 586 (1986); <u>Nissan Fire</u>, 210 F.3d at 1103.  The opposing party cannot "'rest

24  upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets

25  forth specific facts showing that there is a genuine issue for trial.'"  <u>Estate of Tucker v. Interscope</u>

26  <u>Records</u>, 515 F.3d 1019, 1030 (9th Cir. 2008).

27          The opposing party's evidence is to be believed, and all justifiable inferences that may be

28  drawn from the facts placed before the court must be drawn in favor of the opposing party.  <u>See</u>

1    <u>Anderson</u>, 477 U.S. at 255; <u>Matsushita</u>, 475 U.S. at 587; <u>Narayan v. EGL, Inc.</u>, 616 F.3d 895, 899

2    (9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive

3    inference, a "justifiable inference" must still be rational or reasonable.  <u>See</u> <u>Narayan</u>, 616 F.3d at

4    899.  "If conflicting inferences may be drawn from the facts, the case must go to the jury."  <u>Holly</u>

5    <u>D. v. Cal. Inst. of Tech.</u>, 339 F.3d 1158, 1175 (9th Cir. 2003).  Inferences are not drawn out of the

6    air, and it is the opposing party's obligation to produce a factual predicate from which the

7    inference may be drawn.  <u>See</u> <u>Sanders v. City of Fresno</u>, 551 F.Supp.2d 1149, 1163 (E.D. Cal.

8    2008); <u>UMG Recordings, Inc. v. Sinnott</u>, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine

9    issue of material fact does not spring into being simply because a litigant claims that one exists or

10   promises to produce admissible evidence at trial."  <u>Del Carmen Guadalupe v. Agosto</u>, 299 F.3d

11   15, 23 (1st Cir. 2002); <u>see</u> <u>Bryant v. Adventist Health System/West</u>, 289 F.3d 1162, 1167 (9th Cir.

12   2002).  The parties have the obligation to particularly identify material facts, and the court is not

13   required to scour the record in search of a genuine disputed material fact.  <u>Simmons v. Navajo</u>

14   <u>Cnty.</u>, 609 F.3d 1011, 1017 (9th Cir. 2010).  Further, a "motion for summary judgment may not be

15   defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"  <u>Anderson</u>,

16   477 U.S. at 249-50; <u>Hardage v. CBS Broad. Inc.</u>, 427 F.3d 1177, 1183 (9th Cir. 2006).  If the

17   nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the

18   moving party is entitled to summary judgment.  <u>Nissan Fire</u>, 210 F.3d at 1103.

19

20                          **FACTUAL BACKGROUND**[1]

21          Union Pacific operates railroad tracks in 23 states in the western two-thirds of the country,

22   and ships goods throughout the country on its own railroad tracks and through relationships with

23   other shipping providers.  JUMF 2.  Union Pacific operates over 8,000 locomotives, and has

24   approximately 15 to 20 trains running through its Bakersfield, California railyard/hub every day.

25   <u>See</u> JUMF's 3, 4, 5.  Trains travelling between Bakersfield and Los Angeles change crews in

26   Bakersfield (e.g. one crew drives the train from Roseville to Bakersfield and a second crew drives

27

28   _____
[1] "JUMF" refers to the parties' Joint Undisputed Material Fact," "DUMF" refers to "Defendant's Undisputed Material
Fact," and "PUMF" refers to "Plaintiff's Undisputed Material Fact."

the train from Bakersfield to Los Angeles).  JUMF 6.

Locomotive engineers are subject to a Collective Bargaining Agreement ("CBA") negotiated between Union Pacific and the Brotherhood of Locomotive Engineers ("BLE").  See JUMF 8; DUMF 1.  Part of the CBA includes the Roseville Hub Implementing Agreement (the "RHIA") with BLE.[2]  See DUMF 6; Foley Reply Dec. ¶ 3.  Union Pacific locomotive engineers who are members of the United Transportation Union are under the same CBA negotiated by the BLE.  See JUMF 9.  The CBA identifies four different seniority zones.  See DUMF 7.  The RHIA provides in part that "engineers may not move from one Zone to another except in accordance with consolidated seniority provisions which require, among other provisions, the Carrier to post a notice of intent to promote additional engineers so that engineers may request transfer to the Zone with the need for additional engineers."  DUMF 8.  Pursuant to this part of the RHIA, Union Pacific must post for engineer positions in zones and also must award those positions by seniority.  DUMF 9.  The RHIA also provides that an engineer cannot carry his seniority from one zone to another, rather he starts anew with his seniority in the new zone.  DUMF 10.[3]  Only the BLE can allow an engineer to transfer between zones with seniority, and Union Pacific cannot transfer an engineer with seniority between zones without violating the CBA.  See DUMF's 11, 12.[4]

---

[2] Weeks is subject to the RHIA.  See DUMF 18.

[3] Weeks disputes DUMF 10 in part by arguing that the exhibit cited does not support the proposition that an engineer will lose seniority if he transfers into a new zone within the Hub.  See Plaintiff's Response to DUMF 10.  However, apart from the exhibit, Union Pacific's Director of Labor Relations has declared that an engineer would lose seniority when he transfers to a new zone, and Weeks himself testified that he sought a "hardship transfer" to Sparks, Nevada (which is in a different zone than Bakersfield) because he wanted to keep his seniority, i.e. he would have otherwise lost seniority if he transferred to Sparks.  See Foley Dec. ¶ 8; Weeks Depo. 220:4-24.  Therefore, DUMF 10 is not genuinely disputed.

[4] Weeks disputes these DUMF's, and others, by citing to the Union Pacific Job Posting and Staffing Policy.  Weeks argues that this policy allows Union Pacific "to transfer an employee who has suffered an on the job injury without approval from the union."  E.g. Plaintiff's Response to DUMF's 10, 11. 12.  This assertion is also memorialized as PUMF 5.  It is true that a section of the Job Posting and Staffing Policy mentions placing injured employees in other jobs.  However, that section goes on to state that such positions are underwritten by Risk Management and are for a specified period of time.  See id.  Moreover, this section does not discuss retaining seniority, and it makes no reference whatsoever to seniority or the CBA.  Weeks cites no evidence that supports his interpretation of the Job Posting and Staffing Policy or its interaction with the CBA, and his interpretation is not supported by the plain language of the Job Posting and Staffing Policy.  Also, although the Job Posting and Staffing Policy indicates that Union Pacific can place an employee without posting due to personal hardship, that provision applies to situations in which a reorganization is occurring.  There is insufficient evidence to support a conclusion that the Job Posting and Staffing Policy trumps the seniority provisions of the CBA with respect to injured employees.  As a result, all DUMF's that are disputed on the basis of PUMF 5 are not genuinely disputed.

In November 2009, Union Pacific adopted an "Agreement Intracraft Transfer Policy for Operating Craft Employees of Union Pacific Railroad" ("IT Policy").  <u>See</u> DUMF 13; Foley Dec. Ex. 2.  An "Intracraft Transfer" is "any reassignment from one operating craft to an operating craft position at a different work location/seniority district that has not been agreed to under the applicable collective bargaining agreements."  DUMF 14.  The IT Policy explains that a transferring employee loses all of his seniority when he transfers into the new position, absent an agreement to the contrary by the BLE.  <u>See</u> DUMF 16.

The CBA also has a Job Posting and Staffing Policy ("JPS Policy").  <u>See</u> Plaintiff's Ex. 1. The JPS Policy provides for the internal posting of job vacancies for "Band D and below" positions.  <u>See id.</u>  The JPS Policy explains where and when jobs vacancies will be posted, and explains that "agreement and nonagreement" Union Pacific employees may use, and are encouraged to use, the internal posting system.  <u>See id.</u>  Under a Section entitled "Staffing Process," the JPS Policy includes the "Intercraft Transfer Policy," the IT Policy, and provisions regarding applications for job postings.  <u>See id.</u>  Under a Section entitled "Posting Exceptions," the JPS Policy appears to list exceptions to various rules and practices.  <u>See id.</u>  Under a subsection of the "Posting Exceptions" entitled "Reorganization Transfers," the JPS Policy states in part that Union Pacific reserves the right "to place personnel into vacancies without posting to avoid layoffs and/or to address personal hardship."  <u>Id.</u>  Under a subsection of the "Posting Exceptions" entitled "Internal Placement," the JPS Policy provides that an "assignment of an employee, injured on the job and unable to fulfill the responsibilities of his/her position, to another position for which he/she can be qualifiable.  This position is underwritten by a Risk Management program for a specified period of time."  <u>Id.</u>

If a locomotive engineer is unavailable to work, he "lays off" by calling in and coding himself as unavailable.  <u>See</u> Foley Dec. ¶ 16.  Union Pacific monitors the frequency with which engineers "lay off."  DUMF 21.  If Union Pacific believes that an engineer's record warrants, an investigation will be held, and if appropriate, discipline will be issued based on the results of the investigation.  DUMF 22.  When Union Pacific opens an attendance investigation, it notifies the engineer as well as the engineer's union representative.  DUMF 23.

1    Weeks joined Union Pacific in 1996 and became a locomotive engineer in 1999.  See
2    Weeks Depo. 40:5-13.  Weeks currently works as a locomotive engineer at Union Pacific's
3    Bakersfield hub, and has done so for most of his career.  JUMF's 3, 8.  Weeks is also currently a
4    member of the BLE, although in the past he has also been a member of the United Transportation
5    Union.  See JUMF's 7, 9.  As a locomotive engineer, Weeks can transfer to any location in his
6    CBA seniority zone with his seniority.  JUMF 11.  Within Weeks's seniority zone, Weeks can
7    "bump" another engineer with less seniority by taking that engineer's job.  JUMF 12.  Weeks's
8    seniority zone includes San Luis Obispo, Bakersfield, Fresno, and Mojave.  JUMF 10.

9    In October 2001, Weeks accidently inhaled chlorine fumes from a locomotive toilet.
10   DUMF 24.  Because of this accident, Weeks's lungs were injured and he now suffers from asthma,
11   reactive airway syndrome, and a severe acid reflux like condition.  See Weeks Depo. 66:19-67:7.
12   Weeks's lung condition is considered a disability for purposes of this motion.  See Doc. 25-1 at
13   8:15-16.  Although Weeks can otherwise perform the functions of an engineer in general, fumes,
14   dust, and sand that come into the engine cab can aggravate Weeks's lung condition (especially
15   when the train is travelling through tunnels) and cause Weeks to take two to three days off to
16   recover.  See Weeks Depo. 41:2-42:14, 116:24-118:2, 138:19-139:4, 165:2-25.

17   In June 2004, Weeks filed a lawsuit against Union Pacific in state court because of the
18   accident.  See DUMF 25.  In September 2006, Weeks and Union Pacific settled the case and
19   entered into a confidential settlement agreement.  See DUMF 26.  In October 2006, the state court
20   dismissed the lawsuit.  See DUMF 28.

21   Between December 2005 and October 2008, Weeks applied for 30 different positions with
22   Union Pacific.  See Cartwright Dec. Ex. N.  All of the positions were outside of California.  See
23   id.  Weeks was not offered any of these jobs, despite being the "number one contender" on
24   occasion.  See Weeks Dec. ¶ 5.[5]

25   In September 2008, Weeks filed a motion in the Los Angeles Superior Court to enforce the
26   settlement agreement and sought to compel Union Pacific to provide him a new job or
27   alternatively to obtain limited discovery on whether Union Pacific was considering his job

28   _____
     [5] Of the 30 jobs, there is an indication that Weeks declined an interview for one and that another was cancelled.

6

1   applications in good faith.  See DUMF 29; Cartwright Dec. Ex. R.  The state court denied Weeks's

2   motion to enforce and held that Union Pacific had fulfilled its obligations under the settlement

3   agreement.  DUMF 30.

4        Union Pacific has an Equal Employment Department that has created an information sheet

5   that reminds employees that Union Pacific is an equal opportunity employer and has a toll free

6   number and a web address where employees can make complaints.  See DUMF 2.  The

7   information sheet reminds employees that Union Pacific will make reasonable accommodations

8   for employees who have statutorily protected disabilities.  See DUMF 3.  Union Pacific also

9   provides employees with a Reasonable Accommodation Policy that explains the company's

10  obligations and provides examples of reasonable accommodations.  See DUMF 4.  Job

11  assignments that are outside of an employee's seniority in violation of the CBA are given as an

12  example of something that does amount to a reasonable accommodation.  See DUMF 5.

13       Despite an ability to do so, Union Pacific has provided Weeks with no guidance or

14  assistance in obtaining a transfer to a new position or location.  PUMF 1.  Weeks attempted to

15  communicate with Union Pacific to request an accommodation, but he was referred to a hotline

16  where the operator told Weeks that they could not help him.  See PUMF 2.

17       In July 2012, Weeks sought a "hardship transfer" from Bakersfield to Sparks, Nevada.  See

18  Weeks Depo. 53:16-24 & Ex. 21.  Weeks requested the transfer by sending a letter to his union

19  chairman, who then wrote a letter to Union Pacific.  See Weeks Depo. 53:16-54:9.  Weeks was a

20  member of the United Transportation Union at this time.  See DUMF 32.  Weeks wanted a

21  hardship transfer as a way to keep his seniority because, although Sparks is under the RHIA, it is

22  in a higher seniority zone than Bakersfield.  See Weeks Depo. 220:4-24.  Weeks did not request an

23  Intracraft Transfer to Sparks because that would have meant losing his seniority.  See id.; see also

24  DUMF 37.  Weeks also spoke to Max Anderson ("Anderson"), a Senior Risk Management

25  employee of Union Pacific, see Anderson Dec. ¶¶ 1-3, about accommodations by helping Weeks

26  transfer to Sparks or helping to get him a job interview for a position off the trains.  See PUMF 3;

27  Weeks Depo. 108:2-13.  Anderson said that he would talk to someone, but when Weeks would ask

28  about progress, Anderson would say either he had not heard anything or that Weeks needed to

1   contact the union.  See id. at 108:14-19, 109:2-14.

2         Union Pacific does not have a "hardship transfer" policy, rather all transfers are conducted

3   through the CBA and the BLE or through the IT Policy.[6]  See Foley Dec. ¶ 14.  If an engineer

4   wishes to transfer between zones with his seniority, then the BLE must approve the transfer with

5   seniority, otherwise such a transfer would violate the CBA.  See Foley Dec. ¶¶ 9, 10.

6         Around December 2012, the BLE denied Weeks's transfer request.  See Foley Dec. ¶ 13 &

7   Ex. 3; Foley Reply Dec. ¶¶ 4, 5 & Exs. A, B.  Weeks did not apply for non-locomotive jobs in

8   Bakersfield because none had been available.  See Weeks Depo. 297:17-24.

9         In 2013, and probably sometime in 2014,[7] Weeks stopped looking for a position in Sparks

10  because he heard rumors that the Pacific Coast/San Luis Obispo area was going to open back up.

11  See DUMF 40; Weeks Depo. 62:1-9.  From July 2012 to the end of 2013, no engineers or

12  "trainmen" were hired in Sparks.  DUMF 39.

13        In June 2013, weeks requested intermittent leave through December 31, 2013.  See DUMF

14  45.  Weeks' doctor certified that Weeks needed intermittent leave four times per year.  DUMF 46.

15  On July16, Union Pacific approved Weeks's request for intermittent leave.  DUMF 47.

16        In July 2013, Weeks filed a Charge of Discrimination with the EEOC.  DUMF 41.  Weeks

17  complained about not being transferred or hired for a new position despite applications and

18  requests for a transfer, which would have accommodated Weeks's disability.  See DUMF 42.

19  Later in July, the EEOC was unable to conclude that a violation of federal law had occurred and

20  issued Weeks a "Dismissal and Notice of Rights."  See DUMF's 43, 44.  Weeks filed this lawsuit

21  _____

22  [6] Weeks contends that: Union Pacific does have a hardship transfer policy, he obtained such a transfer in 1996/1997,
    he has seen the hardship transfer policy in Union Pacific publications or websites, and hardship transfers permit one to
23  keep seniority.  See Weeks Depo. 158:3-19, 220:1-16, 231:23-233:25.  However, Weeks does not know where the
    "hardship transfer policy" can be found, see id. at 64:12-15, Weeks has not produced a copy of this policy, he gives no
24  time frame of when he actually saw such a policy, and he has not explained the parameters of such a policy or its
    relation to the CBA.  That Weeks obtained what he characterizes as a "hardship transfer" in 1996/1997 does not mean
25  this policy still existed 15 years later when he requested such a transfer in 2012.  In contrast, Union Pacific's Director
    of Labor Relations has declared that no such policy exists.  See Foley Dec. ¶ 14.  It is true that the JPS Policy uses the
26  term "personal hardship."  See Plaintiff's Ex. 1.  However, this is an exception to the posting requirement under the
    "Reorganization Transfer" subsection, and it applies to transfers to vacant positions.  See id.  This subsection does not
27  address retention or loss of seniority.  See id.  Indeed, nothing in the JPS Policy as a whole appears to address the
    retention or loss of seniority or indicate that it supersedes any seniority provisions in the CBA.  See id.  There is an
    insufficient basis to conclude that Union Pacific has a hardship transfer policy as described by Weeks.

28  [7] Weeks's deposition testimony does not provide definite dates.  See Weeks Depo. 61:25-62:6.

                                                    8

1   in July 2013.  DUMF 65.

2          On September 4, 2013, Union Pacific notified Weeks that he needed to submit additional

3   medical certification because he had exceeded the amount of intermittent leave that had been

4   certified by his doctor.  See DUMF 48.  On September 27, 2013, Union Pacific notified Weeks

5   that he had not provided the required medical information, and that he should not use intermittent

6   leave until he provided the requested medical certification.  See DUMF's 48, 49.  On December 2,

7   2013, Weeks provided the requested medical documentation, and Union Pacific conditionally

8   approved Weeks's intermittent leave request three days later.  See DUMF 50, 51.

9          In December 2013, Union Pacific issued to Weeks a Notice of Investigation – First

10   Offense Attendance.  DUMF 52.  On December 13, 2013, Weeks's union contacted Union Pacific

11   and explained that Weeks had been suffering from respiratory issues and that he had reapplied for

12   intermittent leave.  DUMF 53.  On December 17, 2013, Union Pacific postponed the investigation

13   and hearing to January 8, 2014.  DUMF 54.  On January 2, 2014, Union Pacific canceled the

14   investigation and hearing.  DUMF 55.  Weeks did not lose any seniority or pay, and he was not

15   disciplined as a result of the Notice of Investigation.  DUMF 56.

16          Before the December 2013 Notice of Investigation, Union Pacific had issued to Weeks

17   other Notices of Attendance Investigations.  DUMF 57.  Prior to March 2015, Union Pacific

18   eventually dismissed every Notice of Investigation that it filed against Weeks.  See DUMF 58;

19   Weeks Dec. Ex. 4.  Weeks has not lost any seniority or pay, or been disciplined, as a result of any

20   of the Notices of Investigation issued prior to March 2015.  See DUMF's 58, 59; Weeks Dec. Ex.

21   4.

22          In February 2014, Weeks transferred to Mojave, California to work as an engineer.  See

23   DUMF 60.  Because Mojave is in the same seniority zone as Bakersfield, Weeks transferred using

24   his seniority rights under the CBA and "bumped" a less senior engineer from the route.  DUMF

25   61.  Weeks transferred because he thought the air quality in Mojave would be better than the air

26   quality in Bakersfield.  DUMF 62.  Weeks transferred back to Bakersfield from Mojave due to the

27   commute and gas prices.  DUMF 63.  Because his wife had a very good job in Bakersfield and he

28   did not want to make her commute, Weeks did not move to Mojave.  DUMF 64.

In March 2015, Union Pacific sent Weeks a Notice of Attendance Investigation.   See Weeks Dec. ¶ 15 & Ex. 4.  The same month, Weeks was found to have been excessively absent between November 30, 2014 and February 28, 2015.  See Weeks Dec. Ex. 4.  Weeks was notified that this was his first violation of the Attendance Policy and it was being placed in Weeks's permanent record.  See id.


## DEENDANT'S MOTION

**I.   Unopposed Claims**

In his opposition, Weeks indicates that he "does not oppose summary adjudication of the claim of retaliation under FEHA, the Fourth Claim for Relief under Labor Code § 923, or the claim for punitive damages."  Given Weeks's express non-opposition, the Court will grant summary adjudication on the FEHA retaliation claim, the Labor Code § 923 claim, and the request for punitive damages.  See Ramirez v. City of Buena Park, 560 F.3d 1012, 1026 (9th Cir. 2009).


**II.   42 U.S.C. § 12112 – Disability Discrimination**

*Defendant's Argument*

Union Pacific argues that Weeks's ADA discrimination claim fails for several reasons.  First, because Weeks filed his EEOC charge on July 11, 2013, any conduct occurring before September 2012 (300 days before July 2013), is time barred.  Second, the only conduct identified by Weeks within the limitations period (a transfer request to Sparks) did not involve Union Pacific.  Rather, that request was denied by the BLE, and Union Pacific had no involvement in the denial.  Finally, to the extent that Weeks relies on attendance investigations, those investigations were cancelled and they do not constitute adverse employment action.

Union Pacific also argues that Weeks's failure to accommodate claims fail.  First, claims that accrued outside of the 300 day window of Weeks's July 2013 EEOC charge are time barred.  Second, Weeks did not need an accommodation because he could perform the essential functions of his job.  Weeks admitted in his deposition that he could perform the essential functions of the job of locomotive engineer.  Instead, it was the air quality that did not permit him to work as many

days as he wanted.  Third, it was the BLE who denied Weeks a transfer to Sparks.  Fourth, if Union Pacific had transferred Weeks to Sparks with seniority, it would have violated the seniority provisions of the collective bargaining agreement.  Fifth, Weeks did not actively participate in an interactive process.  Weeks could have filled out an Intracraft Transfer form, but he has refused to do so because he would lose his seniority.  Lastly, Weeks did receive an accommodation when he was transferred to Mojave.  Weeks moved back to Bakersfield because of the commute.

*Plaintiff's Opposition*

Weeks argues that he has suffered adverse employment actions because of his disability.  In July 2013, December 2013, and most recently in March 2015, Weeks received Notices of Discipline.  These notices remain in Weeks's permanent file and are taken into consideration by Union Pacific in connection with future discipline and job status decisions.  The March 2015 investigation culminated in a Notice of Discipline Assessed, which clearly constitutes an adverse employment action.  A Notice of Discipline was issued each time Weeks attempted to renew his intermittent leave request due to his medical condition.  Union Pacific was aware of Weeks's condition, as well as the fact that the condition was permanent and it necessitated Weeks needing to take time off.  The Notices were issued because of his medical condition and thus, were unlawful.  Weeks also argues that Union Pacific's attempt to shift blame to the BLE for the denial of a transfer to Sparks is unavailing because the attempt is unsupported by admissible evidence.  Moreover, the Job Posting and Staffing Policy is contrary to Union Pacific's assertion that it cannot transfer an employee with seniority unless the BLE approves.

With respect to a reasonable accommodation, Weeks argues that Union Pacific failed to transfer him to Sparks.  Assuming that the BLE had to agree to transfer Weeks to Sparks with seniority, there is no evidence that Union Pacific made any effort to contact the BLE to seek agreement for a transfer.  Thus, Union Pacific did not meet its obligation under the ADA because it did not ask the BLE to accept a transfer.  Furthermore, aside from a transfer to Sparks, Weeks argues that Union Pacific could have accommodated him with a modified work schedule or job off of the locomotives and out of the elements of dirt, wind and bad air.  However, Union Pacific has made no showing that it explored any of these alternatives.

11

1       *Legal Standards*

2       "The ADA prohibits discrimination against a qualified individual with a disability in

3   regards to terms, conditions and privileges of employment." Gribben v. UPS, 528 F.3d 1166,

4   1169 (9th Cir. 2008).  To make a prima facie case of disparate treatment under the ADA, a

5   plaintiff must show that, within the meaning of the ADA, he: "(1) is disabled; (2) is qualified; and

6   (3) suffered an adverse employment action because of [his] disability." Snead v. Metro. Prop. &

7   Cas. Ins. Co., 237 F.3d 1080, 1087 (9th Cir. 2001).  For an act to be considered an "adverse

8   employment action," the act must "materially" affect the compensation, terms, conditions or

9   privileges of the plaintiff's employment. Jefferson v. Time Warner Cable Enters. LLC, 584 Fed.

10  Appx. 520, 522 (9th Cir. 2014); Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008).

11      The failure to provide a reasonable accommodation to a qualified individual with a

12  disability can constitute discrimination under the ADA.  42 U.S.C. § 12112(b)(5)(A); Kaplan v.

13  City of N. Las Vegas, 323 F.3d 1226, 1232 (9th Cir. 2003).  Once an employee requests an

14  accommodation, "the employer must engage in an interactive process with the employee to

15  determine the appropriate reasonable accommodation." EEOC v. UPS Supply Chain Solutions,

16  620 F.3d 1103, 1110 (9th Cir. 2010); Zivkovic, 302 F.3d at 1089.  This interactive process

17  requires: "(1) direct communication between the employer and employee to explore in good faith

18  the possible accommodations; (2) consideration of the employee's request; and (3) offering an

19  accommodation that is reasonable and effective." UPS Supply, 620 F.3d at 1110-11; Zivkovic,

20  302 F.3d at 1089.  If a defendant fails to engage in an interactive process, "summary judgment is

21  available only if a reasonable finder of fact must conclude that there would in any event have been

22  no reasonable accommodation." Dark v. Curry Cnty., 451 F.3d 1078, 1088 (9th Cir. 2006).

23  However, there is no independent cause of action under the ADA for failing to engage in an

24  interactive process. See Stern v. St. Anthony's Health Ctr., 788 F.3d 276, 292 (7th Cir. 2015);

25  Kramer v. Tosco Corp., 233 Fed. Appx. 593, 596 (9th Cir. 2007).  An employer who fails to

26  engage in the interactive process in good faith faces "liability for the remedies imposed by the

27  statute if a reasonable accommodation would have been possible." Humphrey v. Mem'l Hosp.

28  Ass'n, 239 F.3d 1128, 1137-38 (9th Cir. 2001); Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1116 (9th

1   Cir. 2000) (en banc);[8] <u>EEOC v. Creative Networks, LLC</u>, 912 F.Supp.2d 828, 837 (D. Ariz.

2   2012).  Therefore, at trial, the plaintiff bears the burden of establishing the existence of a

3   reasonable accommodation even if the defendant did not engage in a good faith interactive

4   process.  <u>See</u> <u>Yonemoto v. McDonald</u>, 2015 U.S. Dist. LEXIS 90162, *118-*119 & n.21 (D. Haw.

5   July 10, 2015) (citing numerous cases from other circuit courts of appeal).  When the defendant

6   did not engage in a good faith interactive process, the jury may "bear in mind that had the

7   employer participated in good faith, there may have been other, unmentioned possible

8   accommodations."  <u>Barnett</u>, 228 F.3d at 1115-16 (quotation omitted); <u>Yonemoto</u>, 2015 U.S. Dist.

9   LEXIS 90162 at *125; <u>see also</u> <u>Kramer</u>, 233 Fed. Appx. at 596 ("While the jury may consider

10  whether the range of possible reasonable accommodations extends beyond those proposed when

11  the employer fails to engage in the interactive process . . . failure to engage in that process is not

12  itself evidence of failure to reasonably accommodate.").

13      *Discussion*

14      Before filing suit under the ADA, a plaintiff in California must file a complaint with the

15  EEOC within 300 days of any unlawful adverse action.  <u>See</u> <u>Stiefel v. Bechtel Corp.</u> 624 F.3d

16  1240, 1243-44 (9th Cir. 2010); <u>Joseph v. Pacific Bell</u>, 443 F.3d 1050, 1061 (9th Cir. 2006).

17  Weeks does not dispute that, because he filed his EEOC complaint on July 11, 2013, claims based

18  on conduct that occurred more than 300 days prior to July 11, 2013, are time barred.[9]  Therefore,

19  summary judgment on all ADA claims that are based on conduct that occurred more than 300 days

20  before July 11, 2013, is appropriate.  <u>See</u> <u>id.</u>

21      The parties are also in agreement that conduct surrounding Weeks's July 2012 request to

22  transfer to Sparks (which was denied in December 2012) falls within the 300 day limitations

23  period.  Because Weeks is pursuing two theories of recovery under the ADA, wrongful

24  discrimination and failure to accommodate, the Court finds it appropriate to address both theories

25  separately.

26

27  [8] Vacated on other grounds by <u>U.S. Airways, Inc. v. Barnett</u>, 535 U.S. 391 (2002).

28  [9] The Court notes that Weeks argues that the continuing violations doctrine applies to his FEHA claims, <u>see</u> Doc. No. 33 at 7:18-23, but he makes no such argument with respect to his ADA claims.

1        1.      Adverse Employment Actions

2        For purposes of this motion, there is no dispute that Weeks is a "qualified individual" who

3   has a "disability" under the ADA.  See Doc. No. 25-1 at 14:15-20.  The issue is whether Weeks

4   was subject to an "adverse employment action" because of his disability.  Snead, 237 F.3d at

5   1087.  There are three possible adverse employment actions at issue – the 2012 denial of a transfer

6   to Sparks, the December 2013 Notice of Investigation, and the March 2015 Notice of Discipline.

7        a.      Transfer Request To Sparks

8        Weeks requested a transfer to Sparks with seniority in July 2012.[10]   Under the CBA and

9   more particularly the RHIA, Union Pacific cannot transfer an employee with seniority between

10  zones without BLE approval.  See DUMF's 7-12.  The submitted evidence shows that the entity

11  that denied Weeks his transfer with seniority was the BLE, not Union Pacific.  See Foley Dec. ¶

12  13 & Ex. 3; Foley Reply Dec. ¶¶ 4, 5 & Exs. A, B.[11]  There is no evidence that Union Pacific

13  played any role in the BLE's decision to deny the transfer, or that Union Pacific was somehow

14  responsible for BLE's decision to deny the transfer.  Furthermore, there is no evidence that Union

15  Pacific disregards BLE decisions with respect to transfers between zones with seniority.  Because

16  BLE denied Weeks his requested transfer, Union Pacific did not inflict an adverse employment

17  action against Weeks.  Summary judgment in favor of Union Pacific on this theory is appropriate.

18       b.      December 2013 Notice of Investigation[12]

19       Union Pacific sent Weeks a Notice of Investigation dated December 10, 2013 ("December

20

─────────────────────

21  [10] The Court will assume for purposes of this motion that the decision to deny Weeks his transfer with seniority could
    be considered an "adverse employment action" under FEHA.  Cf. Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir.
    1997) (in the context of a Title VII retaliation claim noting that the denial of a transfer could constitute an adverse
22  employment action where transfers were common and arguably a privilege of employment).

23  [11] Weeks objected that there was a lack of foundation for key e-mails and that David Foley lacked personal knowledge
    of the e-mails since he was not listed as a recipient.  Weeks does not explain precisely what is meant by "lack of
24  foundation," but from the rest of his objection, the Court reads it as being tied to Foley's alleged lack of personal
    knowledge.  See Doc. No. 33-4.  So reading the objections, they are overruled.  Foley's reply declaration explains that
25  he had a conversation with a BLE official, and he received the e-mail correspondences from the BLE official shortly
    thereafter.  See Foley Reply Dec. ¶¶ 4, 5 & Exs. A, B.  Foley's reply declaration adequately demonstrates knowledge.

26
    [12] Weeks's opposition classifies the December 2013 Notice of Investigation as a "Notice of Discipline."  However, the
27  document provided to the Court shows that it is entitled "Notice of Investigation."  See Foley Dec. Ex. F.  The only
    Notice of Discipline that has been provided to the Court is dated March 2015.  See Weeks Dec. Ex. 4.  In the absence
28  of evidence to show that Weeks received a "Notice of Discipline" in December 2013, the Court will view the
    December Notice as a Notice of Investigation.

                                          14

1  Notice"). DUMF 52. There is no dispute that Union Pacific cancelled the associated hearing and

2  ceased its investigation on January 2, 2014. See DUMF 55. It is also undisputed that Weeks

3  suffered no loss of seniority, no loss of pay, and no discipline as a result of the December Notice.

4  See DUMF 56. These facts indicate that the December Notice was not an adverse employment

5  action. See Davis, 520 F.3d at 1089.

6         Weeks contends that although he suffered no discipline or loss of pay or seniority "as a

7  result" of the December Notice, the December Notice itself is a form of discipline. This is based

8  on deposition testimony from Weeks to the effect that: a notice of investigation is the first rung on

9  the ladder of the termination process, that 99% of the time the notice means a termination is

10  coming, Weeks has received many Notices, the Notices stay on an employee's permanent record,

11  Weeks has been told by a Union Pacific manager that his name is towards the top of a "hit list"

12  known as the Employee Risk Assessment List ("ERA List"), employees on the ERA List are

13  targeted for extra regulatory testing, and managers are told to try and terminate the employment of

14  employees whose names appear thereon. See Weeks Depo. 20:2-23:19, 149:17-150:5.

15         The Court does not find that this evidence creates a genuine dispute. First, Weeks has

16  presented no policies or procedure from Union Pacific, or deposition testimony from Union

17  Pacific managerial employees, that deal with employee discipline in general or show that Union

18  Pacific views a Notice of Investigation as a form of discipline or adverse action.

19         Second, even if a Notice of Investigation is the first procedural step to assessing discipline,

20  there is no evidence that the process itself is a form of discipline or adverse action. Weeks did not

21  dispute that, if there is an attendance issue, Union Pacific will institute an investigation and if

22  appropriate will assess discipline "based on the results of the investigation." DUMF 22. Thus, if

23  the results of the investigation show that no discipline is appropriate, then no discipline will be

24  assessed. If anything, a Notice of Investigation appears to be a tool for an employee and the BLE

25  to address Union Pacific's concerns before any discipline is actually assessed; it is not itself

26  discipline. See id.; cf. Ware v. Billington, 344 F.Supp.2d 63, 76 (D. D.C. 2004) (holding that

27  without an adverse effect on employment, "mere initiation of the investigation" is not actionable)

28         Third, Weeks has identified no adverse consequences or effects that have stemmed from

1   the December Notice.  Weeks did testify that receiving a Notice of Investigation means that 99%

2   of the time the employee will be terminated.  However, Weeks was not terminated by Union

3   Pacific following the December Notice.  Weeks's testimony also indicates that receiving a Notice

4   of Investigation places an employee on the ERA "hit list."  However, Weeks has not produced a

5   copy of this list, has not produced any Union Pacific policy concerning the ERA list (including

6   how an employee is placed on the list and how the list is used actually used by Union Pacific), and

7   has not produced evidence that he was subject to extra testing or that any Union Pacific manager

8   has attempted to terminate him.  Moreover, even if Weeks's name is on the ERA list, there is no

9   evidence that his name is on that list because of the December Notice or that he has moved up that

10  list because of the December Notice.  What role the December Notice might have played on

11  Weeks in relation to the ERA list is wholly unknown.  Weeks also has testified that a Notice of

12  Investigation becomes part of the employee's permanent employment file.  However, Weeks's

13  evidence does not support this assertion.  The employment document cited by Weeks contains

14  several places in which Weeks received a "Letter of Warning" concerning attendance, but there

15  are no notations for a "Notice of Investigation."  See Weeks Dec. Ex. 3.  There is no evidence that

16  the term "Letter of Warning" is another method for documenting that an employee has received a

17  "Notice of Investigation."  A "Letter of Warning" sounds like the result of an investigation, it does

18  not sound like a mere notification.  Without more from Weeks, the Court cannot conclude that the

19  "Letter of Warning" notations on his employment record are meant to document the mere issuance

20  of a "Notice of Investigation."

21          In sum, Weeks has not shown that the December Notice (or any Notice of Investigation) is

22  an "adverse employment action."  Summary judgment in favor of Union Pacific on this claim is

23  appropriate.

24                  c.      March 2015 Notice of Discipline

25          On March 19, 2015, Weeks received a Notice of Discipline ("March NOD").  See Weeks

26  Dec. Ex. 4.  The March NOD indicates that Weeks was found to be excessively absent between

27  November 30, 2014 and February 28, 2015 in violation of Union Pacific policy.  See Weeks Dec.

28  Ex. 4.  The Notice of Discipline states that this is Weeks's "first violation of the Union Pacific

1  Railroad Attendance Policy which is being recorded on your personal record." Id.  Weeks

2  declares that Union Pacific disciplined him "because [he] was absent due to my continuing serious

3  lung problem."  Weeks Dec. ¶ 15.

4       The March NOD is a very recent occurrence, and it post-dates both this summary judgment

5  motion and the operative complaint.  It appears that the first time the March NOD has been raised

6  in this case is as part of Weeks's opposition.  Generally, a new theory raised for the first time in an

7  opposition will not defeat summary judgment.  See Fossen v. Blue Cross & Blue Shield of Mont.,

8  660 F.3d 1102, 1115 (9th Cir. 2011); Navajo Nation v. United States Forest Serv., 535 F.3d 1058,

9  1080 (9th Cir. 2008).

10      Although Courts have discretion to consider a new theory raised in an opposition to be a

11  request to amend, see Kaplan v. Rose, 49 F.3d 1363, 1370 (9th Cir. 1994); cf. Fossen, 660 F.3d at

12  1115 (holding that district court was within its discretion in denying leave to amend where theory

13  was raised first in opposition to summary judgment), the Court declines to permit amendment at

14  this time.  The Court knows very little about the March NOD or the circumstances surrounding it.

15  Weeks has done little more than attach the letter as an exhibit to his declaration.  Although the

16  March NOD contains a subject line of "notice of discipline assessed," there is no discipline that is

17  apparent.  No demotion, loss of pay, or loss of work privileges are disclosed within the notice

18  itself.  Instead, the March NOD informs Weeks that he has violated a policy and that this will be

19  noted on his record.  The March NOD reads more as a type of warning than as actual discipline.

20  Courts have found that letters of warning or reprimand that are unaccompanied by an actual

21  adverse effect on compensation, terms, conditions, or privileges of employment do not constitute

22  "adverse employment actions."  See Lloyd v. Swifty Transp., Inc., 552 F.3d 594, 602 (7th Cir.

23  2009); Lambdin v. Marriott Resorts Hospitality Corp., 2015 U.S. Dist. LEXIS 6631, *8-*9 (D.

24  Haw. Jan. 21, 2015); Moore v. Marriott Int'l, Inc., 2014 U.S. Dist. LEXIS 154914, *27-*30 (D.

25  Ariz. Oct. 31, 2014); Hoang v. Wells Fargo Bank, N.A., 724 F.Supp.2d 1094, 1104 (D. Or. 2010);

26  Runkle v. Gonzales, 391 F.Supp.2d 210, 225-26 (D. D.C. 2005).  As the evidence stands, the

27  March NOD does not appear to be an "adverse employment action," which would make an

28  amendment futile at this time.  Therefore, the March NOD cannot defeat summary judgment.

2.      Failure to Accommodate

a.      Transfer To Sparks With Seniority

The evidence shows that a unilateral transfer of Weeks to Sparks with seniority would violate the CBA/RHIA.  See DUMF's 10, 11, 12.  Under the CBA/RHIA, a transfer of Weeks to Sparks is to be without seniority.  See id.  A violation of a seniority system under a collective bargaining agreement is a presumptively unreasonable accommodation for purposes of the ADA.  See U.S. Airways, 535 U.S. at 403-06.  Weeks bears the "burden of showing special circumstances that make an exception from the seniority system reasonable in [his] particular case."  Id. at 405-06.

Weeks contends that Union Pacific did not contact BLE about transferring him to Sparks with seniority.  However, the BLE was aware of Weeks's request, considered his situation, and denied the transfer.  See Foley Rep. Dec. ¶¶ 4, 5 & Exs. A, B.  Weeks cites no evidence or authority that, in addition to his own efforts and contacts with the BLE, Union Pacific also was required to contact the BLE about the transfer.

Weeks also argued in response to various DUMF's that Union Pacific could have transferred him with seniority through a "hardship transfer."  See PUMF 5.  However, as discussed above, Weeks has not presented sufficient evidence that such a "hardship transfer" policy existed in July 2012.  See Footnote 6 supra.  Weeks produced no documentary evidence that supported the existence of such a policy, and he could not identify when or how he saw such a policy documented.  See id.  Although Weeks stated that he benefitted from such a "hardship transfer," this was 15 years ago.  See id.  In contrast, Union Pacific's managerial employees declared that there is not a "hardship transfer" policy, the JPS Policy only mentions hardship transfers during reorganization and short term positions underwritten by Human Resources for employees who are injured on the job, and the IT Policy (which was adopted in 2009) provides for transfers between zones but mandates that the transfer be without seniority.  See id.; DUMF 13; Foley Dec. Ex. 2; Plaintiff's Ex. 1.  At best, Weeks has presented colorable evidence of a "hardship transfer" policy by Union Pacific, which is insufficient.  See Hardage, 427 F.3d at 1183.

Weeks has not overcome the presumption of U.S. Airways.  Therefore, Weeks's proposed

1  transfer to Sparks is not a reasonable accommodation, and summary judgment in favor of Union

2  Pacific on this theory is appropriate.

3          b.      Other Accommodations

4          Weeks contends that Union Pacific failed to engage in an interactive process with him.

5  There is no evidence that Union Pacific engaged in an interactive process with Weeks from July

6  2012 forward.[13]  See Weeks Depo. 245:20-246:17; Weeks Dec. ¶ 13. The failure to engage in an

7  interactive process affects the burdens in the context of summary judgment.  See Yonemoto, 2015

8  U.S. Dist. LEXIS 90162 at *115.  If Union Pacific did not engage in an interactive process, then it

9  can only obtain summary judgment by showing that no reasonable accommodation was available

10 to Weeks.  See Dark, 451 F.3d at 1088.  Union Pacific has not argued that no reasonable

11 accommodation was available.

12         Instead, Union Pacific contends that Weeks was responsible for any breakdown in the

13 interactive process because he did not complete an Intracraft Transfer Form.  It is true that if a

14 plaintiff is responsible for the breakdown of an interactive process, then the plaintiff cannot

15 recover for a failure to provide reasonable accommodation.  See Department of Fair Empl. &

16 Hous. v. Lucent Techs., Inc., 642 F.3d 728, 743 (9th Cir. 2011); Zivkovic, 302 F.3d at 1089.

17 However, the interactive process "requires communication and good-faith exploration of possible

18 accommodations between employers and individual employees. . . . [e]mployers must consult

19 with employees so that both parties discover the precise limitations and the types of

20 accommodations which would be most effective." Barnett, 228 F.3d at 1114-15; see also UPS

21 Supply, 620 F.3d at 1110-11.  Here, to the Court's understanding, an Intracraft Transfer request is

22 limited to assessing transfers between specific employment zones.  There is no evidence that

23 filling out an Intracraft Transfer form will include an exploration of Weeks's condition and

24 possible accommodations.  In other words, there is no indication that filling out the transfer form

25

26 [13] The Court notes that Ruth Arnush, who is Union Pacific's Western Region Disability Prevention manager, declared that she worked with Weeks in December 2013 and January 2014 to provide him light duty as an accommodation of his work restriction.  See Arnush Dec. ¶ 12.  Arnush also declares that she worked with Weeks on other unspecified

27 occasions to provide him with an accommodation, including a medical leave of absence.  See id.  While Arnush's declaration indicates some communication has occurred between Weeks and Union Pacific, her declaration does not

28 describe the kind of process envisioned by Barnett.  See Barnett, 228 F.3d at 1114-15; see also UPS Supply, 620 F.3d at 1110-11; Zivkovic, 302 F.3d at 1089.

1   would result in an interactive process as described in *Barnett*.  Further, the interactive process is

2   triggered by a request for an accommodation.  See *Barnett*, 228 F.3d at 1111.  The "employee is

3   not required to use any particular language when requesting an accommodation but need only

4   inform the employer of the need for an adjustment due to a medical condition."  *Zivkovic*, 302

5   F.3d at 1089.  That is, an employee may express the need for an adjustment in "plain English" and

6   without mentioning the ADA or using the phrase "reasonable accommodation."  *Barnett*, 228 F.3d

7   at 1112.  Here, it is undisputed that Weeks requested an accommodation when he spoke with

8   Anderson about transferring to Sparks or finding a position off the trains.  See PUMF 3; see also

9   Weeks Depo. 108:2-111:10.  In fact, shortly before contacting the EEOC, Weeks told Anderson

10  that Union Pacific was violating the law by not accommodating him.  See Weeks Depo. 271:20-

11  272:1.  Viewing the evidence in the light most favorable to Weeks, this appears to have been a

12  request for an accommodation that triggered Union Pacific's duty to engage in an interactive

13  process.  See *Zivkovic*, 302 F.3d at 1089; *Barnett*, 228 F.3d at 1111-12.  That Weeks may not

14  have used a preferred method of requesting an accommodation does not excuse Union Pacific

15  from engaging in an interactive process.  Therefore, the failure of Weeks to fill out an Intracraft

16  Transfer form does not constitute a breakdown of the interactive process.

17        Union Pacific also argues that Weeks's deposition testimony shows that he does not need

18  an accommodation in order to perform the essential functions of his job.  Specifically, Union

19  Pacific cites two passages of deposition testimony to the effect that Weeks does not require an

20  accommodation in order to perform the job skills of an engineer, but Weeks does require an

21  accommodation from the elements that the job places Weeks in, see Weeks Depo. 117:14-118:2,

22  and the elements in which Weeks has to perform the functions of a locomotive engineer adversely

23  affect him.  See id. at 138:19-139:4.  At other points in his deposition, however, Weeks testified

24  that diesel fumes, sand, and dust enter into the cabin while he operates the locomotive, that this

25  aggravates his asthma, and that the problem is exacerbated when he drives the train through

26  tunnels.  See id. at 41:2-42:14, 138:19-139:4, 165:2-25.

27        The determination of essential job functions is generally a question of fact.  See Henschel

28  v. Clare Cnty. Rd. Comm'n, 737 F.3d 1017, 1022 (6th Cir. 2014); Bates v. UPS, 511 F.3d 974,

1   991 & n.7 (9th Cir. 2007).  Union Pacific has not identified any essential functions of a

2   locomotive engineer.  A fair reading of Weeks's testimony is that he agrees that he can perform

3   the physical and mental tasks that are required to actually operate the train.  However, the

4   conditions within the train's cab change while the train is being operated, and it is those conditions

5   within the cab that cause most of Weeks's problems.  Stated differently, the operation of the train

6   creates a work environment within the train cab that exposes Weeks to various fumes and

7   particulate matter.  It seems self-evident that an ability to tolerate fumes generated by a machine

8   during work, or to tolerate environmental conditions that a person is regularly exposed to while

9   performing a job, constitutes an essential function of a job.  Cf. Dickerson v. Secretary, Dept. of

10  Veterans Affairs Agency, 489 Fed. Appx. 358, 361 (11th Cir. 2012) (affirming summary judgment

11  that a staff nurse could not perform the essential functions of her job because she could not

12  tolerate exposure to dust and chemicals that were in a hospital); Cassidy v. Detroit Edison Co.,

13  138 F.3d 629, 631-35 (6th Cir. 1998) (holding that a computer center worker could not perform

14  the essential functions of her job due to asthma and exposure to fumes, odors, and allergens);

15  Anderson v. Georgia-Pac. Wood Prods., LLC, 942 F.Supp.2d 1192, 1209 (M.D. Ala. 2013)

16  (finding that plaintiff could not perform the essential functions of a press operator in light of

17  permanent restrictions against exposure to *inter alia* dust, fumes, and chemicals); Kaufmann v.

18  GMAC Mortg. Corp., 2006 U.S. Dist. LEXIS 30615, *37-*44 (holding that a loan specialist could

19  not perform the essential functions of her job because she had an allergy to perfume and her co-

20  workers and third parties would wear perfume near her).  Weeks's testimony plainly shows that he

21  requires an accommodation so that he can tolerate the work environment to which he is exposed

22  while operating a train.  Therefore, Weeks's testimony does not show that he can perform the

23  essential functions of an engineer without accommodation.

24      Union Pacific also argues that Weeks received an accommodation when he was transferred

25  to Mojave.  However, the rigors and cost of the commute from Bakersfield to Mojave caused

26  Weeks to move back to Bakersfield.  See DUMF 63.  An ineffective accommodation is not a

27  reasonable accommodation.  See UPS Supply, 620 F.3d at 1110; Humphrey, 239 F.3d at 1137.

28  Union Pacific has presented no evidence that Weeks's reasons for transferring back were

1   unreasonable.  Cf. UPS Supply, 620 F.3d at 1110 ("The reasonableness of an accommodation is

2   ordinarily a question of fact.").  Moreover, the evidence indicates that Weeks obtained the transfer

3   to Mojave on his own by utilizing existing policies and procedures.  Weeks Depo. 26:7-15, 34:20-

4   35:22.  There is no evidence that the transfer was the result of any interactive processes.  Cf. UPS

5   Supply, 620 F.3d at 1110-11; Barnett, 228 F.3d at 1114-15.  But, even if the transfer to Mojave

6   could be considered an accommodation that resulted from an interactive process, the fact that one

7   accommodation was tried does not relieve Union Pacific.  The duty to accommodate is on-going,

8   and if an employee asks for a different accommodation, the obligation to engage in an interactive

9   process or try another reasonable accommodation is triggered.  UPS Supply, 620 F.3d at 1110-11

10   Finally, Union Pacific argues in its reply memorandum that Weeks has not sufficiently

11   identified a reasonable accommodation.  However, under Ninth Circuit law, because the evidence

12   indicates that Union Pacific did not engage in any kind of interactive process, Union Pacific has

13   the burden at summary judgment to show that no reasonable accommodation was available.  See

14   Dark, 451 F.3d at 1088.  At this stage, Union Pacific's failure to meet its burden excuses any

15   failure by Weeks to adequately identify an accommodation.  See id.; Yonemoto, 2015 U.S. Dist.

16   LEXIS 90162 at *115.

17   In sum, Union Pacific has failed to show that no reasonable accommodations were

18   available.[14]  Therefore, summary judgment on this cause of action is not appropriate.  See id.

19

20   **III.    Gov. Code § 12940(a) – Disability Discrimination**

21   *Defendant's Argument*

22   Union Pacific argues that Weeks's FEHA discrimination claim fails for many of the same

23   reasons as his ADA discrimination claim -- conduct occurring outside of the FEHA limitations

24

---

25   [14] The Court notes that Weeks identified a transfer to a non-locomotive position in Bakersfield as a possible
accommodation.  See Doc. No. 33 at 11:18-22.  But, Weeks also testified that there were no such positions in
26   Bakersfield.  See Weeks Depo. 297:17-24.  This strongly suggests that reassignment to a non-locomotive position in
Bakersfield is not a reasonable accommodation.  See Fredenburg v. Contra Costa County Dep't of Health Servs., 172
27   F.3d 1176, 1180 (9th Cir. 1999).  However, the Ninth Circuit has held that employers are to consider vacant positions,
as well as positions that are expected to become vacant within a reasonable period of time.  See Dark, 451 F.3d at
28   1089-90.  Because there is no evidence regarding expected job openings, it remains an open question whether a
transfer to a non-locomotive position in Bakersfield was a reasonable accommodation.

1  period (one year from the date Weeks filed his EEOC complaint) are time barred, the BLE refused

2  Weeks's transfer with seniority to Sparks, and the Notices of Investigation do not constitute

3  adverse employment actions.

4       *Plaintiff's Opposition*

5       Weeks argues that the FEHA one-year limitations period does not bar any of his claims

6  because the continuing violations doctrine applies in this case.  Union Pacific refused to assist him

7  in obtaining a transfer, despite Weeks submitting numerous transfer requests and seeking a

8  transfer informally.  Weeks argues that Union Pacific takes the position in its motion that he

9  should have continued to seek a transfer, which is tantamount to a concession that there was no

10  degree of permanence to the prior denials.  Further, Weeks argues that Union Pacific engaged in

11  adverse employment actions by refusing his transfer him to Sparks, failing to contact the BLE

12  about the transfer, and issuing Notices of Investigation and Discipline.

13       *Legal Standards*

14            1.    Statute of Limitation/Continuing Violation

15       Employees who believe they have been discriminated against in violation of FEHA

16  "generally have one year in which to file an administrative complaint with the DFEH, the agency

17  charged with administering the FEHA."  McDonald v. Antelope Valley Community College Dist.,

18  45 Cal.4th 88, 106 (2008) (citing Cal. Gov. Code § 12960(d)).  However, the continuing violation

19  doctrine constitutes an exception to FEHA's one-year limitations period.  See Richards v. CH2M

20  Hill, Inc., 26 Cal.4th 798, 801-02 (2001); Acuna v. San Diego Gas & Elec. Co., 217 Cal.App.4th

21  1402, 1412 (2013).  "The continuing violation doctrine aggregates a series of wrongs or injuries

22  for purposes of the statute of limitations, treating the limitations period as accruing for all of them

23  upon commission or sufferance of the last of them."  Aryeh v. Canon Business Solutions, Inc., 55

24  Cal.4th 1185, 1192 (2013).  That is, the continuing violation doctrine will treat a series of

25  unlawful actions as a single, actionable course of conduct.  Richards, 26 Cal.4th at 802.  The

26  continuing violation doctrine applies when an employer's unlawful acts are:  (1) sufficiently

27  similar in kind; (2) have occurred with reasonable frequency; and (3) have not acquired a degree

28  of permanence.  Richards, 26 Cal.4th at 823; Acuna, 217 Cal.App.4th at 1412.  "'Permanence' . . .

1   should properly be understood to mean the following:  that an employer's statements and actions

2   make clear to a reasonable employee that any further efforts at informal conciliation to obtain

3   reasonable accommodation or end harassment will be futile."  Richards, 26 Cal.4th at 823; Acuna,

4   217 Cal.App.4th at 1412.  The employer must engage in a series of unlawful acts; it is insufficient

5   to merely demonstrate continuing ill effects from a past violation or a failure to correct a past

6   wrong.  See Pacific Gas & Elec. Co. v. Public Utilities Com., 237 Cal.App.4th 812, 855 (2015).

7               2.   Discrimination

8        FEHA "prohibits discrimination based on an employee's physical disability."  Green v.

9   State of Cal., 42 Cal.4th 254, 262 (2007); see Cal. Gov. Code § 12940(a).  A plaintiff may

10   establish a prima facie case of disability discrimination under FEHA if he shows that he: (1)

11   suffered from a disability, (2) was otherwise qualified to do his or her job, and (3) was subjected

12   to an adverse employment action because of the disability.  Nealy v. City of Santa Monica, 234

13   Cal.App.4th 359, 378 (2015); Furtado v. State Personnel Bd., 212 Cal.App.4th 729, 744 (2013).

14   An adverse employment action must materially affect the terms, conditions, or privileges of

15   employment.  Jones v. Lodge at Torrey Pines Partnership, 42 Cal.4th 1158, 1168 (2008); McRae

16   v. Department of Corrections & Rehabilitation, 142 Cal.App.4th 377, 386 (2006).

17         *Discussion*

18               1.   Statute of Limitations

19        As discussed above, Weeks filed his claim of discrimination with the EEOC in July 2013.

20   Application of FEHA's one-year limitations period would bar any conduct that occurred prior to

21   July 2012.  Although Weeks is correct that the continuing violation doctrine would make pre-July

22   2012 conduct actionable, Weeks has not met the doctrine's requirements.

23        First, Weeks has identified about 30 applications for a transfer/reassignment that Union

24   Pacific refused between late 2005 and 2008.[15]  See Cartwright Dec. Ex. N.  The applications were

25

---

26   [15] The Court notes that Weeks has also identified attendance warning letters in September 2010, November 2011, and July 2013 as unlawful acts.  See Weeks Dec. ¶ 17 & Ex. 4.  However, Weeks has not shown that these letters

27   constitute "adverse employment actions" because there is no evidence that they materially affected his compensation, terms, conditions, or privileges of employment.  See Jones, 42 Cal.4th at 1168; McRae, 142 Cal.App.4th at 386; see also Lambdin, 2015 U.S. Dist. LEXIS 6631 *8-*9 (holding that a mere reprimand/right up does not constitute an

28   adverse employment action).   Because there is no evidence that the letters were adverse employment actions, they do not constitute "unlawful acts" for purposes of the continuing violation doctrine.

for various open positions located throughout the United States, although none were in California. See id. There is no evidence that Weeks applied for an open position after 2008. Weeks has not explained how these denials were similar to any conduct by Union Pacific that occurred after July 2012. The closest conduct is the denial of a transfer to Sparks with seniority, but it was the BLE who made that decision, and there is no evidence that any positions in Sparks were actually open.

Second, from 2008 to July 2012 is a period of four years. The Court is aware of no authority that would hold a gap of about four years between occurrences is sufficient to show that the occurrences are "reasonably frequent."

Third, and relatedly, the status quo remaining unchanged for a period of about four years shows a significant degree of permanence. Weeks's reliance on Union Pacific's summary judgment arguments is not persuasive. Union Pacific argued that Weeks never applied for a transfer to Sparks under the IT Policy. While the IT Policy provides a vehicle to obtain such a transfer, it does not permit Weeks to transfer with seniority. It is the loss of seniority that Weeks finds objectionable, and it is the reason why Weeks has not submitted an Intracraft Transfer request. If anything, Union Pacific's invocation of the IT Policy demonstrates that it does not intend to transfer Weeks with seniority, unless the BLE consents.

Because Weeks has not met any of the elements of the continuing violation doctrine, summary judgment on all FEHA claims based on pre-July 2012 conduct is appropriate.[16]

## 2.   Discrimination

For the reasons discussed above with respect to the ADA, Weeks has not shown that he suffered an adverse employment action. First, the BLE, not Union Pacific, was the entity who was responsible for the denial of Weeks's July 2012 request to transfer to Sparks with seniority. See Foley Dec. ¶ 13 & Ex. 3; Foley Reply Dec. ¶¶ 4, 5 & Exs. A, B. Second, Weeks has presented no evidence that the December Notice was anything other than a notification. As a mere notification, it did not materially affect the terms, conditions, or privileges of his employment. Cf. McRae, 142 Cal.App.4th at 392 (holding that filed letters, a memorandum of instruction, and an investigation

---

[16] The FHEA § 12960(d) one year limitations period applies to all of Weeks's FEHA claims, not just claims under FEHA § 12940(a). See Cal. Gov. Code § 12960(a). Thus, all of Weeks's FEHA claims that pre-date July 2012 are time barred.

were not adverse employment actions because they did not materially affect the terms, conditions, or privileges of employment).  Third, the March NOD is not part of the operative complaint, and Weeks has not demonstrated that the March NOD impacted the terms, conditions, or privileges of his employment.  See Lambdin, 2015 U.S. Dist. LEXIS 6631 at *8-*9; McRae, 142 Cal.App.4th at 392.  Therefore, summary judgment on Weeks's second cause of action is appropriate.

**III.    Gov. Code § 12940(k) -- Failure To Prevent Discrimination**

It is unlawful under FEHA for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."  Cal. Gov. Code § 12940(k); Carter v. California Dept. of Veterans Affairs, 38 Cal.4th 914, 925 n.4 (2006).  "[C]ourts have required a finding of actual discrimination or harassment under FEHA before a plaintiff may prevail under § 12940(k)."  Carter, 38 Cal.4th at 925 n.4; see Scotch v. Art Institute of Cal., 173 Cal.App.4th 986, 1021 (2009); Trujillo v. North Cnty. Transit Dist., 63 Cal.App.4th 280, 298 (1998).  That is, if the employee does not show that she was actually discriminated against or harassed, there is no liability under § 12940(k).  Department of Fair Empl. & Hous. v. Lucent Techs., Inc., 642 F.3d 728,748 (9th Cir. 2011); Kelley v. The Conoco Cos., 196 Cal.App.4th 191, 208 (2011).

Here, Weeks has not alleged a FEHA harassment claim, and his second cause of action for FEHA discrimination under § 12940(a) fails.  As discussed above, Weeks either failed to demonstrate that Union Pacific inflicted adverse employment actions against him, he relied on conduct that was time barred, or he relied on conduct that is not fairly reflected in the operative complaint.  Given the absence of actionable discrimination, summary judgment on his § 12940(k) claim is appropriate.  See Lucent Techs, 642 F.3d at748; Boudreaux v. J.B. Hunt Transp., Inc., 2015 U.S. Dist. LEXIS 104761, *15 (E.D. Cal. Sept. 2, 2015); Kelley, 196 Cal.App.4th at 208.

**IV.    Gov. Code § 12940(m) -- Failure To Accommodate**

*Defendant's Argument*

Union Pacific argues that dismissal of this claim is appropriate for similar reasons as the discrimination claims under the ADA and FEHA.  First, Weeks did not need an accommodation to

1   perform the essential functions of his job.  Second, the statute of limitations bars conduct that

2   occurred prior to July 2012.  Third, BLE is the entity that denied Weeks's transfer to Sparks with

3   seniority, and Weeks never completed an Intracraft Transfer request.  Fourth, Weeks was

4   accommodated by a transfer to Mojave, but he returned to Bakersfield because he did not like the

5   commute.

6            *Plaintiff's Opposition*

7            Aside from a transfer to Sparks, Weeks argues that Union Pacific could have

8   accommodated him with a modified work schedule or job off of the locomotives and out of the

9   elements of dirt, wind and bad air.  However, Union Pacific has made no showing that it explored

10  any of these alternatives.

11           *Legal Standard*

12           FEHA prohibits an employer from failing "to make reasonable accommodation for the

13  known physical or mental disability of an . . . employee."  Cal. Gov. Code § 12940(m).  The

14  elements of a failure to accommodate claim are: (1) the plaintiff has a disability covered by

15  FEHA; (2) the plaintiff is a qualified individual; and (3) the employer failed to reasonably

16  accommodate the plaintiff's disability.  Furtado v. State Personnel Bd., 212 Cal.App.4th 729, 744

17  (2013); Cuiellette v. City of Los Angeles, 194 Cal.App.4th 757, 766 (2011).  "Reasonable

18  accommodation" means "a modification or adjustment to the workplace that enables the employee

19  to perform the essential functions of the job held or desired."  Lui v. City & County of San

20  Francisco, 211 Cal.App.4th 962, 971 (2012).  The obligation to reassign an employee "does not

21  require creating a new job, moving another employee, promoting the disabled employee, or

22  violating another employee's rights under a collective bargaining agreement."  Furtado, 212

23  Cal.App.4th at 745.  An employer will be liable under § 12940(m) "only if the work environment

24  could have been modified or adjusted in a manner that would have enabled the employee to

25  perform the essential functions of the job."  Nadaf-Rahrov v. Neiman Marcus Group, Inc., 166

26  Cal.App.4th 952, 975 (2008).  An employer cannot prevail on summary judgment on a claim of

27  failure to reasonably accommodate unless it establishes through undisputed facts that:  (1)

28  reasonable accommodation was offered and refused; (2) there simply was no vacant position

1    within the employer's organization for which the disabled employee was qualified and which the

2    disabled employee was capable of performing with or without accommodation; or (3) the

3    employer did everything in its power to find a reasonable accommodation, but the informal

4    interactive process broke down because the employee failed to engage in discussions in good faith.

5    Lucent Techs., 642 F.3d at 744; Jensen v. Wells Fargo Bank, 85 Cal. App. 4th 245, 263 (2000).

6        *Discussion*

7        As discussed above, unilaterally transferring Weeks to Sparks with seniority is not a

8    reasonable accommodation because, once the BLE denied the transfer, Union Pacific would have

9    violated the seniority provisions of the CBA/RHIA.  Summary judgment on any FEHA

10   accommodation claim based on a transfer to Sparks with seniority is appropriate.  See U.S.

11   Airways, 535 U.S. at 403-06; Furtado, 212 Cal.App.4th at 745; McCullah v. Southern Cal. Gas

12   Co., 82 Cal.App.4th 495, 501 (2000).

13       With respect to any other accommodations claim, the Court has already addressed Union

14   Pacific's arguments.  Moreover, Union Pacific can prevail on summary judgment by making one

15   of the three showings outlined in *Lucent Techs.* and *Jensen*.  Union Pacific has not established that

16   reasonable accommodation was offered and refused, nor has it established that there were no

17   vacant positions in its organization for which Weeks was qualified.  See Lucent Techs., 642 F.3d

18   at 744; Jenson, 85 Cal.App.4th at 263.  Union Pacific does argue that Weeks is responsible for the

19   breakdown of the interactive process.  However, as discussed above, the evidence does not show

20   that Weeks is responsible for any "breakdown."  Although Weeks requested accommodation,

21   Union Pacific never engaged in an interactive process.  Moreover, per *Lucent Tech.* and *Jensen*,

22   Union Pacific was also obliged to show that it did everything in its power to find a reasonable

23   accommodation.  See id.  The evidence presented to the Court does not indicate that Union Pacific

24   did much of anything in its power to find an accommodation.  Although Union Pacific transferred

25   Weeks to Mojave, that was a result of Weeks's utilizing existing procedures on his own, and there

26   is no indication that it was the result of anything that can be reasonably classified as an interactive

27   process.  Because Union Pacific has not met its burden under *Lucent Techs.* and *Jensen*, summary

28   judgment on the remaining aspects of Weeks's § 12940(m) is inappropriate.

1   **V.    Gov. Code § 12940(n) – Failure To Engage In An Interactive Process**

2       *Defendant's Argument*

3       Union Pacific argues that Weeks's interactive process claims fail for several reasons.  First,

4   Weeks did not need an accommodation to perform his job.  Second, BLE denied his transfer to

5   Sparks with seniority.  Third, Weeks transferred to Mojave, but returned because he did not like

6   the commute.  Fourth, Weeks is responsible for the breakdown of the interactive process because

7   he has not completed an Intracraft Transfer request.

8       *Plaintiff's Opposition*

9       Weeks argues that he submitted multiple requests for transfers, but Union Pacific took no

10  steps to participate in an interactive process.  Weeks argues that he bid for a position in Mojave on

11  his own, but could not endure the expense and strain of the commute from Mojave to Bakersfield.

12  Union Pacific had an obligation to participate in an interactive process, but it failed to do so.

13      *Legal Standard*

14      Under FEHA, it is an unlawful employment practice to "fail to engage in a timely, good

15  faith, interactive process with the employee or applicant to determine effective reasonable

16  accommodations, if any, in response to a request for reasonable accommodation by an employee

17  or applicant with a known physical or mental disability or known medical condition."  Cal. Gov.

18  Code § 12940(n).  "The 'interactive process' required by the FEHA is an informal process with

19  the employee or the employee's representative, to attempt to identify a reasonable accommodation

20  that will enable the employee to perform the job effectively.  Ritualized discussions are not

21  necessary."  Scotch, 173 Cal.App.4th at 1013; see Nadaf-Rahrov, 166 Cal.App.4th at 984-85.

22  "Although it is the employee's burden to initiate the process, no magic words are necessary, and

23  the obligation arises once the employer becomes aware of the need to consider an

24  accommodation."  Scotch, 173 Cal.App.4th at 1013.  Once the interactive process is initiated, both

25  parties have the obligations to participate in good faith, to keep communications open, and to not

26  obstruct the process.  Swanson v. Morongo Unified Sch. Dist., 232 Cal.App.4th 954, 971-72

27  (2014); Scotch, 173 Cal.App.4th at 1013.  Once there has been an opportunity to conduct

28  discovery on the issue, a § 12940(n) plaintiff "must identify a reasonable accommodation that

1   would have been available at the time the interactive process should have occurred." <u>Nealy v.</u>

2   <u>City of Santa Monica</u>, 234 Cal.App.4th 359, 379 (2015); <u>Scotch</u>, 173 Cal.App.4th at 1018.

3           *Discussion*

4           The Court has already addressed Union Pacific's arguments.  First, Weeks's deposition

5   testimony shows that he cannot perform the essential functions of a locomotive engineer without

6   accommodation because of the environment to which Weeks is exposed as a result of operating

7   the locomotive.  Second, the transfer to Mojave was done by Weeks himself through existing

8   Union Pacific policies, it was not the result of any interactive process.  Moreover, there is an on-

9   going duty to find a reasonable accommodation and engage in an interactive process when it is

10  apparent that an attempted accommodation is not working.  <u>See</u> <u>Swanson</u>, 232 Cal.App.4th at 969;

11  <u>Scotch</u>, 173 Cal.App.4th at 1013.  Third, there is no evidence that Weeks is responsible for the

12  breakdown of any interactive process because Union Pacific did not engage in an interactive

13  process, and there is no indication that filling out an Intracraft Transfer request constitutes an

14  "interactive process."  <u>Cf.</u> <u>Nadaf-Rahrov</u>, 166 Cal.App.4th at 984-85 (citing <u>Barnett</u>, 228 F.3d at

15  1114-15 in describing the nature of an interactive process).  Finally, Union Pacific is correct that at

16  least one accommodation at issue is not reasonable as a matter of law – a unilateral transfer to

17  Sparks with seniority.  As discussed above, BLE is responsible for that denial, and if Union

18  Pacific unilaterally transfers Weeks, it would be a violation of the CBA/RHIA.  There is no

19  liability for the failure of Union Pacific to transfer Weeks to Sparks with seniority.  <u>See</u> <u>U.S.</u>

20  <u>Airway</u>, 535 U.S. at 403-06; <u>Furtado</u>, 212 Cal.App.4th at 745; <u>McCullah</u>, 82 Cal.App.4th at 501.

21          Therefore, summary judgment will be denied with respect to Weeks's § 12940(n) claim,

22  except to the extent that it may be based on a failure to transfer Weeks to Sparks with seniority.

23

24  **VI.    Gov. Code § 12945.2(*l*) – CFRA Retaliation**

25          *Defendant's Argument*

26          Union Pacific argues *inter alia* that Weeks's CFRA claim is largely a repackaging of

27  Weeks's ADA and FEHA claims.  For the reasons that the ADA and FEHA claims fail, so too

28  should the CFRA claim fail.

1    *Plaintiff's Opposition*

2          Weeks argues that Union Pacific has violated both the anti-retaliation and anti-interference

3    provisions of the CFRA.  Weeks argues that the Notices of Investigation, Letters of Warning,

4    denial of transfers, and the March NOD all constitute adverse employment actions for purposes of

5    retaliation.  Furthermore, each time Weeks submitted updated medical documentation, he was

6    subject to a Notice of Investigation, despite Union Pacific's knowledge of Weeks's lung condition

7    and need for CFRA leave.  Union Pacific continued to discipline Weeks for exercising his rights to

8    legally protected leave.  These constant threats and pressure by Union Pacific constitutes unlawful

9    CFRA interference.

10   *Legal Standard*

11         The CFRA is the California counterpart to the federal Family and Medical Leave Act (29

12   U.S.C. § 2601 et seq.).  Rogers v. County of Los Angeles, 198 Cal.App.4th 480, 487 (2011).

13   Violations of the CFRA fall into two types of claims -- "interference claims," which prevent

14   employers from wrongly interfering with employees' approved leaves of absence, and

15   "retaliation," claims which prevent employers from terminating or otherwise taking action against

16   employees because they exercise their CFRA rights.  Richey v. AutoNation, Inc., 60 Cal.4th 909,

17   920 (2015); Rogers, 198 Cal.App.4th at 487-88.  Section 12945.2(*l*) prohibits retaliation.  Dudley

18   v. Department of Transportation, 90 Cal.App.4th 255, 264-65 (2001).  The elements of a CFRA

19   retaliation cause of action are:  (1) the defendant was a covered employer; (2) the plaintiff was

20   eligible for CFRA leave; (3) the plaintiff exercised his right to take a qualifying leave; and (4) the

21   plaintiff suffered an adverse employment action because he exercised the right to take CFRA

22   leave.  Rogers, 198 Cal.App.4th at 488; Faust v. California Portland Cement Co., 150 Cal.App.4th

23   864, 885 (2007).  Adverse employment actions are those that materially affect the terms,

24   conditions, or privileges of employment, see Yanowitz v. L'Oreal USA, Inc., 36 Cal.4th 1028,

25   1053 (2005), such as terminations, fines, or suspensions.[17]  Faust, 150 Cal.App.4th at 885.

26   ────────────────────

27   [17] *Yanowitz* was not a CFRA case, but *Faust* cited extensively to *Yanowitz*'s discussion of FEHA retaliation.  Faust, 150 Cal.App.4th at 885.  Also, the CFRA is part of FEHA, see Rogers, 198 Cal.App.4th at 487, and *Yanowitz*'s discussion of "adverse employment actions" was meant to address adverse employment actions under § 12940(h) as

28   well as § 12940(a).  Jones, 42 Cal.4th at 1168; Yanowitz, 36 Cal.4th at 1050-54.  In the absence of contrary authority, the Court sees no reason to use different definitions of "adverse employment action" for different parts of FEHA.

1       *Discussion*

2              Weeks cannot establish a violation § 12945.2(*l*) because he has not established that Union

3       Pacific took adverse actions against him.  As discussed above, BLE was the entity that denied a

4       transfer to Sparks with seniority, pre-July 2012 conduct is time barred, Weeks has not established

5       that Letters of Warning, Notices of Investigation, or the December Notice materially affects his

6       employment at Union Pacific, and the March NOD is not part of the operative complaint (nor is

7       there is a sufficient indication at this time that it materially and adversely affected Weeks's

8       employment).  Without an adverse employment act by Union Pacific, there can be no CFRA

9       retaliation.  See Rogers, 198 Cal.App.4th at 488; Faust, 150 Cal.App.4th at 885; Dudley, 90

10      Cal.App.4th at 261.  Therefore, summary judgment on Weeks's § 12945.2(*l*) claim is appropriate.

11             Weeks's opposition does raise a CFRA interference claim.  However, Weeks's third cause

12      of action, which is the only cause of action under the CFRA, expressly invokes § 12945.2(*l*).  See

13      Doc. No. 1 at 5:18-6:5.  Indeed, it is partially entitled "Retaliation for Taking Medical Leave."  Id.

14      There is no CFRA interference claim included in the third cause of action.

15             As discussed above, generally a new theory raised for the first time in an opposition will

16      not defeat summary judgment.  See Fossen, 660 F.3d at 1115; Navajo Nation, 535 F.3d at 1080.

17      For similar reasons discussed in connection with the March NOD and Weeks's discrimination

18      claim, the Court declines to grant Weeks leave to amend.  Weeks's discussion of CFRA

19      interference is about a page in length and not well developed.  Weeks does not apply or cite to 2

20      Cal. Code Reg. § 11094 (the regulation that attempts to define "interference" under the CFRA) nor

21      does he cite to any other authority that would indicate that the conduct at issue amounts to

22      "interference."  Weeks merely identifies notices and warnings that appear to relate to absences.

23      There is no discussion of the circumstances surrounding the issuance of the notices and warnings,

24      or the content thereof, nor is there an explanation of the effects of the notices and warnings, if any.

25      Just as the Court could not conclude that such notices constitute "adverse employment actions,"

26      the Court without more cannot find that they constitute "interference."  Further, many of the

27      notices and warnings fall outside of FEHA's one year limitations period.  There is no discussion of

28      how pre-July 2012 conduct is actionable as part of a CFRA interference claim.  Finally, aside from

1    the March NOD, there is no new conduct at issue.  Discovery closed in January 2015, see Doc.

2    No. 24, and there is no explanation why Weeks did not seek to include a CFRA interference claim

3    based on conduct that preceded the March NOD prior to his opposition.  Therefore, invocation of a

4    CFRA interference claim does not defeat summary judgment on the third cause of action.

5

6    **VII.    Second Summary Judgment Motion & Motion To Amend**

7         This order has substantially narrowed this case.  Currently, the only claims that will

8    proceed to trial are failure to accommodate under the ADA, failure to accommodate under FEHA

9    § 12940(m), and failure to engage in an interactive process under FEHA § 12940(n).  There is no

10   pre-trial conference or trial date in effect at this time.

11        Summary judgment was denied on Weeks's claims because Union Pacific generally failed

12   to meet the appropriate burdens of proof.  Now that those burdens have been explained, if Union

13   Pacific believes that there are no genuine disputed issues of material fact as to any of the

14   remaining claims, then the Court will permit Union Pacific to file a second summary judgment

15   motion.  See Hoffman v. Tonnemacher, 593 F.3d 908, 911 (9th Cir. 2010).  If Union Pacific

16   wishes to pursue a second motion, it will be required to file a request with the Court within 14

17   days of service of this order.  The Court then will issue a briefing schedule shortly after receiving

18   Union Pacific's request.  Consistent with Rule 11, Union Pacific should only file a second

19   summary judgment motion if it has a good faith belief that it can meet its burden and that there are

20   no genuinely disputed issues of material fact.[18]  If Union Pacific does not file a request to pursue a

21   second summary judgment motion, then the parties will be required to contact the Magistrate

22   Judge for the purpose of entering a new scheduling order that sets new pre-trail conference and

23   trial dates.

24        Also, because summary judgment has been denied in part and there is no trial date, the

25   Court will permit Weeks to pursue a motion to amend his complaint to include claims regarding

26   the March NOD.  Weeks should only file such a motion with the Magistrate Judge if, consistent

27
     ───────────────
28   [18] The Court is not opining that a second summary judgment would be granted.  The Court is merely granting
     permission to file a second motion, if Union Pacific has a good faith belief that there are no genuinely disputed
     material facts.

1   with Rule 11, he has a good faith belief that he has viable claims and that amendment is proper

2   under the circumstances.[19]  As part of the new scheduling order process, Weeks may request a

3   briefing schedule with the Magistrate Judge for filing a motion to amend.  If Weeks files a motion

4   to amend, that motion will be heard by the Magistrate Judge.

5          Prior to the parties pursuing either a motion to amend or second summary judgment

6   motion, the parties are to meet and confer in order to help determine the advisability of pursuing

7   either motion.  The failure of a party to meet and confer will result in the denial of that party's

8   motion.

9

10                                    **ORDER**

11         Accordingly, IT IS HEREBY ORDERED that:

12

13   1.   Consistent with the above analysis, Defendants' motion for summary judgment is

14        DENIED with respect to:

15        a.    The first cause of action for ADA failure to accommodate occurring post-

16              September 2012:

17        b.    The second cause of action for failure to accommodate under FEHA § 12940(m)

18              occurring post-July 2012, and failure to engage in an interactive process under

19              FEHA § 12940(n) occurring post-July 2012;

20

21   2.   Defendant's motion for summary judgment is otherwise GRANTED, as discussed above,

22        including any claim based on the failure of Union Pacific to transfer Weeks to Sparks with

23        seniority from July 2012 forward;

24

25   3.   If Defendant wishes to pursue a second summary judgment motion, Defendant shall file a

26        request as discussed above within fourteen (14) days of service of this order; and

27

---

[19] The Court is not opining that any claims based on the March NOD are viable, or that a motion to amend will be
28  granted if filed.  The Court is only granting permission to file a motion to amend, if Weeks has a good faith belief that
    amendment is proper under the circumstances.

4.     If Defendant does not file a request to pursue a second summary judgment motion, the parties shall contact the Magistrate Judge within twenty-eight (28) days of service of this order for the purposes of arranging for the entry of a new scheduling order, which may include a possible briefing schedule for a motion to amend (as discussed above).

IT IS SO ORDERED.

Dated:   October 7, 2015

_____

SENIOR  DISTRICT  JUDGE