UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TREVOR WEEKS, | CASE NO. 1:13-CV-1641 AWI JLT |
| **Plaintiff** | |
| v. | ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| UNION PACIFIC RAILROAD CO., | |
| **Defendant** | (Doc. No. 54) |

        This is an employment discrimination case brought by Plaintiff Trevor Weeks ("Weeks") against his employer, Defendant Union Pacific Railroad ("Union Pacific"). Weeks alleges causes of action for disability discrimination under 42 U.S.C. § 12112 (the Americans with Disabilities Act) ("ADA") and state law for disability discrimination under California Government Code § 12940 (the Fair Employment and Housing Act) ("FEHA"). Previously, the Court granted in part and denied in part a motion for summary judgment by Union Pacific. See Doc. No. 43. Following that order, the Court permitted Union Pacific to file a second summary judgment motion. See id. & Doc. No. 49. Union Pacific has now filed its second motion for summary judgment. For the reasons that follow, the motion will be denied.

## SUMMARY JUDGMENT FRAMEWORK

        Summary judgment is proper when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-

1  Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears

2  the initial burden of informing the court of the basis for its motion and of identifying the portions

3  of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine

4  issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d

5  265 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is

6  "material" if it might affect the outcome of the suit under the governing law.  See Anderson v.

7  Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114

8  (9th Cir. 2009).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a

9  reasonable jury to return a verdict for the non-moving party.  Anderson, 477 U.S. at 248;

10  Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

11       Where the moving party will have the burden of proof on an issue at trial, the movant must

12  affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.

13  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an

14  issue at trial, the movant may prevail by presenting evidence that negates an essential element of

15  the non-moving party's claim or by merely pointing out that there is an absence of evidence to

16  support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Herbert

17  Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a moving party

18  fails to carry its burden of production, then "the non-moving party has no obligation to produce

19  anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan

20  Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If the moving party

21  meets its initial burden, the burden then shifts to the opposing party to establish that a genuine

22  issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio

23  Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest

24  upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets

25  forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope

26  Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

27       The opposing party's evidence is to be believed, and all justifiable inferences that may be

28  drawn from the facts placed before the court must be drawn in favor of the opposing party.  See

1    <u>Anderson</u>, 477 U.S. at 255; <u>Matsushita</u>, 475 U.S. at 587; <u>Narayan v. EGL, Inc.</u>, 616 F.3d 895, 899

2    (9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive

3    inference, a "justifiable inference" must still be rational or reasonable.  <u>See</u> <u>Narayan</u>, 616 F.3d at

4    899.  Summary judgment may not be granted "where divergent ultimate inferences may

5    reasonably be drawn from the undisputed facts."  <u>Fresno Motors, LLC v. Mercedes Benz USA,</u>

6    <u>LLC</u>, 771 F.3d 1119, 1125 (9th Cir. 2015); <u>see also</u> <u>Holly D. v. Cal. Inst. of Tech.</u>, 339 F.3d 1158,

7    1175 (9th Cir. 2003).  Inferences are not drawn out of the air, and it is the opposing party's

8    obligation to produce a factual predicate from which the inference may be drawn.  <u>See</u> <u>Fitzgerald</u>

9    <u>v. El Dorado Cnty.</u>, 94 F.Supp.3d 1155, 1163 (E.D. Cal. 2015); <u>Sanders v. City of Fresno</u>, 551

10   F.Supp.2d 1149, 1163 (E.D. Cal. 2008).  ""A genuine issue of material fact does not spring into

11   being simply because a litigant claims that one exists or promises to produce admissible evidence

12   at trial."  <u>Del Carmen Guadalupe v. Agosto</u>, 299 F.3d 15, 23 (1st Cir. 2002); <u>see</u> <u>Bryant v.</u>

13   <u>Adventist Health System/West</u>, 289 F.3d 1162, 1167 (9th Cir. 2002).  The parties have the

14   obligation to particularly identify material facts, and the court is not required to scour the record in

15   search of a genuine disputed material fact.  <u>Simmons v. Navajo Cnty.</u>, 609 F.3d 1011, 1017 (9th

16   Cir. 2010). Further, a "motion for summary judgment may not be defeated . . . by evidence that is

17   'merely colorable' or 'is not significantly probative.'"  <u>Anderson</u>, 477 U.S. at 249-50; <u>Hardage v.</u>

18   <u>CBS Broad. Inc.</u>, 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party fails to produce

19   evidence sufficient to create a genuine issue of material fact, the moving party is entitled to

20   summary judgment.  <u>Nissan Fire</u>, 210 F.3d at 1103.

21

22                          **FACTUAL BACKGROUND**[1]

23          Union Pacific operates railroad tracks in 23 states in the western two-thirds of the country,

24   and ships goods throughout the country on its own railroad tracks and through relationships with

25   other shipping providers.  <u>See</u> Doc. No. 43 at pp. 3-10.

26          Locomotive engineers are subject to a Collective Bargaining Agreement ("CBA")

27

28   [1] The Factual Background is taken largely from the Court's prior order on Defendant's first motion for summary
     judgment.  New facts or evidence submitted in connection with the second motion for summary judgment are referred
     to either by the source of the evidence or by "DUMF" ("Defendant's Undisputed Material Fact").

1    negotiated between Union Pacific and the Brotherhood of Locomotive Engineers ("BLE").  See id.

2    Part of the CBA includes the Roseville Hub Implementing Agreement (the "RHIA") with BLE.

3    See id.  In 1998, Union Pacific merged with Southern Pacific Railroad.  See Foley Reply Dec. ¶ 4.

4    The RHIA was effective February 24, 1998, and was the result of negotiations between Union

5    Pacific, Southern Pacific, and the BLE for the integration of the two railroads' unionized

6    workforces.  See id.  The RHIA divides the Roseville Hub into four different seniority zones.  See

7    id.  The RHIA provides in part that "engineers may not move from one Zone to another except in

8    accordance with consolidated seniority provisions which require, among other provisions, the

9    Carrier to post a notice of intent to promote additional engineers so that engineers may request

10   transfer to the Zone with the need for additional engineers."  Doc. No. 43 at pp. 3-10.  Pursuant to

11   this part of the RHIA, Union Pacific must post for engineer positions in zones and also must

12   award those positions by seniority.  See id.  Under the RHIA, locomotive engineers hired or

13   promoted on or before September 1, 1997, were assigned "prior rights."[2]  See Foley Reply Dec.

14   Ex. 1 at § II(B)(5).  "Prior rights" are seniority within an employee's Zone and protect the ability

15   of engineers to use their seniority for route bidding and time off.  See Foley Dec. ¶ 6.  Also under

16   the RHIA, all engineers employed in any of the Zones as of the RHIA's effective date, and all

17   engineers hired after the effective date, received "common seniority" dates that applied across all

18   Zones.  See id. at ¶ 7.  In other words, all engineers receive "common seniority."  See id.

19        In May 2004, Union Pacific and the BLE entered into a Memorandum of Understanding

20   ("MOU") entitled, "Agreement Modifications – Engineer Compensation and Utilization."  DUMF

21   74.  Section VII of the MOU establishes an "Application (Standing Bid) System."  DUMF 75.

22   Under Section VII, an engineer can submit a standing application to any location or all locations in

23   which he would like to work.  DUMF 76.  When an engineer position becomes vacant or a new

24   one is created, after 7 days posting, Union Pacific offers the position to the engineer with the most

25   seniority.  DUMF 77.  If a union employee wants to be considered for any union position in

26

27   [2] There is a genuine dispute as to which date was the last date for obtaining "prior rights."  Foley declares that no prior rights were available for employees hired on or after the effective date of the RHIA, i.e. February 24, 1998.  See Foley Reply Dec. ¶¶ 4, 6.  However, Weeks has cited the above quoted portion of the RHIA, which indicates September 1,

28   1997, was the last date to obtain "prior rights seniority."  Without more from Union Pacific, and because Weeks is the non-moving party, the Court accepts Weeks's date of September 1, 1997.  See Narayan, 616 F.3d at 899.

1    another location within his Zone, he must file a standing bid with that location.  DUMF  78.

2         If a locomotive engineer is unavailable to work, he "lays off" by calling in and coding

3    himself as unavailable.  See Doc. No. 43 at pp. 3-10.  Union Pacific monitors the frequency with

4    which engineers "lay off."  See id..  If Union Pacific believes that an engineer's record warrants,

5    an investigation will be held, and if appropriate, discipline will be issued based on the results of

6    the investigation.  See id.  When Union Pacific opens an attendance investigation, it notifies the

7    engineer as well as the engineer's union representative.  See id.

8         Weeks was hired in 1996 and became a locomotive engineer in 1999.  See Weeks Depo.

9    40:5-13.  Weeks currently works as a locomotive engineer at Union Pacific's Bakersfield hub

10   (Zone 2), and has done so for most of his career.  See Doc. No. 43 at pp. 3-10.  Weeks also is

11   currently a member of the BLE, although in the past he has also been a member of the United

12   Transportation Union.  See id.

13        In October 2001, Weeks accidently inhaled chlorine fumes from a locomotive toilet.  See

14   id.  Because of this accident, Weeks's lungs were injured and he now suffers from asthma,

15   reactive airway syndrome, and a severe acid reflux like condition.  See id.  Weeks's lung condition

16   is considered a disability for purposes of this motion.  See id.  Although Weeks can otherwise

17   perform the functions of an engineer in general, the fumes, dust, and sand that come into the

18   engine cab can aggravate Weeks's lung condition (especially when the train is travelling through

19   tunnels) and cause Weeks to need to take two to three days off to recover.  See id.

20        Between December 2005 and October 2008, Weeks applied for 30 different positions with

21   Union Pacific.  See id.  All of the positions were outside of California.  See id.  Weeks was not

22   offered any of these jobs, despite being the "number one contender" on occasion.  See id.

23        Despite an ability to do so, Union Pacific has provided Weeks with no guidance or

24   assistance in obtaining a transfer to a new position or location.  See id.  Weeks attempted to

25   communicate with Union Pacific to request an accommodation, but he was referred to a hotline

26   where the operator told Weeks that they could not help him.  See id.

27        In July 2012, Weeks sought a "hardship transfer" from Bakersfield to Sparks, Nevada.  See

28   id.  Weeks requested the transfer by sending a letter to his union chairman, who then wrote a letter

1    to Union Pacific.  See id.  Weeks was a member of the United Transportation Union at this time.

2    See id.  Weeks wanted a hardship transfer as a way to keep his seniority because, although Sparks

3    is under the RHIA, it is in a higher seniority zone than Bakersfield.  See id.  Weeks also spoke to

4    Max Anderson, a Senior Risk Management employee of Union Pacific, about accommodations by

5    helping Weeks transfer to Sparks or helping to get him a job interview for a position off the trains.

6    See id.

7           Around December 2012, the BLE denied Weeks's transfer request.  See id.  Weeks did not

8    apply for non-locomotive jobs in Bakersfield because none had been available.  See id.  During

9    July 2012 to October 2013, the only vacant and/or new non-union Union Pacific positions in

10   California were Manager Operating Practices positions.  See Roybal Dec. ¶¶ 2-3.  Because these

11   are management positions, Union Pacific considers them to be a promotion from a union engineer

12   position.  See id. at ¶ 3.  In order to be promoted to a management position, it appears that Union

13   Pacific requires its employees to pass an OMB Management Test.  See Weeks Opp. Dec. (Doc.

14   No. 58-2) ¶ 3.  From 2009 through 2014, Weeks was eligible for promotion but could not be

15   promoted because he could not be scheduled to take the OMB Test.  See id.  On numerous

16   occasions, Weeks was referred to and approached Union Pacific employee Ruth Arnish about

17   taking the OMB Test, but Arnish put Weeks off for various reasons and never allowed him to take

18   the test.  See id.

19          In 2013, and probably sometime in 2014, Weeks stopped looking for a position in Sparks

20   because he heard rumors that the Pacific Coast/San Luis Obispo area was going to open back up.

21   See Doc. No. 43 at pp. 3-10.  From July 2012 to the end of 2013, no engineers or "trainmen" were

22   hired in Sparks.  See id.

23          In June 2013, weeks requested intermittent leave through December 31, 2013.  See id.

24   Weeks' doctor certified that Weeks needed intermittent leave four times per year.  See id.  On

25   July16, Union Pacific approved Weeks's request for intermittent leave.  See id.  Union Pacific's

26   Crew Management Timekeeper System allows engineers to lay off at any time for health reasons.

27   See id.  According to David Foley, Union Pacific's Director of Labor Relations, if a serious health

28   condition under the state or federal family medical leave statutes or statutory disability causes the

1  absence, Union Pacific does not count the absence against or penalize the employee.  See id.

2        On September 4, 2013, Union Pacific notified Weeks that he needed to submit additional

3  medical certification because he had exceeded the amount of intermittent leave that had been

4  certified by his doctor.  See id.  On September 27, 2013, Union Pacific notified Weeks that he had

5  not provided the required medical information, and that he should not use intermittent leave until

6  he provided the requested medical certification.  See id.  On December 2, 2013, Weeks provided

7  the requested medical documentation, and Union Pacific conditionally approved Weeks's

8  intermittent leave request three days later.  See id.

9        In December 2013, Union Pacific issued to Weeks a Notice of Investigation – First

10  Offense Attendance.  See id.  On December 13, 2013, Weeks's union contacted Union Pacific and

11  explained that Weeks had been suffering from respiratory issues and that he had reapplied for

12  intermittent leave.  See id.  On December 17, 2013, Union Pacific postponed the investigation and

13  hearing to January 8, 2014.  See id.  On January 2, 2014, Union Pacific canceled the investigation

14  and hearing.  See id.  Weeks did not lose any seniority or pay, and he was not disciplined as a

15  result of the Notice of Investigation.  See id.

16        Before the December 2013 Notice of Investigation, Union Pacific had issued to Weeks

17  other Notices of Attendance Investigations.  See id.  Prior to March 2015, Union Pacific

18  eventually dismissed every Notice of Investigation that it filed against Weeks.  See id.  Weeks has

19  not lost any seniority or pay, or been disciplined, as a result of any of the Notices of Investigation

20  issued prior to March 2015.  See id.

21        In March 2015, Union Pacific sent Weeks a Notice of Attendance Investigation.  See id.

22  The same month, Weeks was found to have been excessively absent between November 30, 2014

23  and February 28, 2015.  See id.  Weeks was notified that this was his first violation of the

24  Attendance Policy and it was being placed in Weeks's permanent record.  See id.

25        Also, in March 2015, two engineers (Baker and Green) transferred from Bakersfield to

26  engineer positions in Roseville.  See Hood Dec. ¶ 2; Foley Reply Dec. ¶ 9.  Among the Union

27  Pacific employees, it is commonly discussed that Roseville's air quality is better than

28  Bakersfield's, and that there are no tunnel problems in Roseville that could affect an engineer's

breathing.  See Hood Dec. ¶ 7.  Per the RHIA, Bakersfield is in Zone 2 and Roseville is in Zone 1.

See id. at ¶ 2; Foley Reply Dec. ¶ 9.  Baker and Green responded to a Union Pacific bulletin that

indicated engineering positions were available in Roseville.  See Hood Dec. ¶ 5; Foley Reply Dec.

¶ 11.  Baker and Green were appointed to Roseville because they had the most common seniority

of anyone who bid for the positions.  See Foley Reply Dec. ¶ 14.  Although Baker and Green

retained their "common seniority," they had no "prior seniority" in Zone 1.  See id. at ¶ 9.  In fact,

Baker and Green had no "priority rights" at all because they were hired after the effective date of

the RHIA.  See id.  This meant that they were less senior than any locomotive engineer with "prior

rights" in Zone 1, and that other engineers with "prior rights" seniority in Zone 1 could outbid

Baker and Green for routes.  See id. at ¶¶ 14-15.  That is, any engineers in Zone 1 who were hired

before the effective date of the RHIA, could outbid Baker and Green.  See id.  Baker and Green

had less seniority than Weeks.  See Hood Reply Dec. ¶ 4.  The transfers were not controlled by

BLE, but were under the full control of Union Pacific.  See id. at ¶ 3.  This was the type of transfer

that Weeks had previously attempted to obtain.  See Weeks Mtn. to Amend Dec. (Doc. No. 56-2)

at ¶ 3.  The Roseville routes would have accommodated Weeks's disability.  See id.


**DEENDANT'S MOTION**

**I.     ADA – Discrimination -- Failure To Reasonably Accommodate**

   *Defendant's Argument*

        Union Pacific argues that Weeks's ADA claim fails for several reasons.  First, no

reasonable accommodation existed.  From July 2012 to October 2013, the only vacant or new non-

union jobs were management positions, which are promotions from the CBA.  However, an

employer is not required to promote an employee as a means of accommodation.  Second, all

union positions outside of Zone 2 suffer from the same flaws as Weeks's desire to transfer to

Sparks – he can only transfer if he loses seniority and he is not willing to lose his seniority.  Third,

union positions in Zone 2 are awarded by seniority.  Since 2004, there has been a system in place

for an employee to have a standing bid for transfers.  To obtain a transfer, all he must do is file a

standing bid.  Fourth, Weeks does have a reasonable accommodation available to him.  In

1   discovery responses, Weeks asked for a modified schedule, by which he meant the ability to lay-

2   off from work as needed due to health problems.  Union Pacific has this in place, and there is no

3   penalty for laying-off due to health and disability reasons.

4       Additionally, as part of a reply, Union Pacific argues that Baker and Green are not

5   similarly situated to Weeks.  Baker and Green only had "common rights."  However, Weeks has

6   "common rights" and "prior rights."  It is only the "prior rights" that are lost when transferring

7   between employment Zones.  The only way to keep "prior rights" when transferring to a different

8   Zone is with BLE approval.  Because Baker and Green had no "prior rights," their situation is not

9   the same as Weeks.

10      *Plaintiff's Opposition*

11      Weeks argues that summary judgment should be denied so that additional discovery can

12  occur.  Weeks requests that the depositions of Ruth Arnish, Tania Roybal, and David Foley be

13  taken so that issues regarding transfers, available positions, and the reasons that Weeks was

14  prevented from taking the OMB Test can be explored.  Previous counsel was unable to take

15  relevant depositions, which are now needed to explore the various issues and address summary

16  judgment.  Weeks's current counsel needs additional discovery to develop the case.

17      Additionally, Weeks has declared that Arnish was not cooperative in arranging for Weeks

18  to take an OMB Test over a period of 5 years.  Also, Weeks has submitted declarations that he was

19  promoted to engineer in 1999 and thus, had no "prior rights."  The transfer of Baker and Green

20  was the type of transfer that he had been requesting, yet Union Pacific never provided it.  Finally,

21  Weeks has declared that Union Pacific has refused to permit him to return to work and refused to

22  give him access to its computer system in order to check for open positions.

23      *Legal Standards*

24      The failure to provide a reasonable accommodation to a qualified individual with a

25  disability can constitute discrimination under the ADA.  42 U.S.C. § 12112(b)(5)(A); <u>EEOC v.

26  UPS Supply Chain Solutions</u>, 620 F.3d 1103, 1110 (9th Cir. 2010).  As relevant here, the term

27  "reasonable accommodation" means "[m]odifications or adjustments that enable a covered entity's

28  employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by

9

1   its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(iii); UPS

2   Supply, 620 F.3d at 1110.  While there is no comprehensive list, some "reasonable

3   accommodations" include:  job restructuring, part-time or modified work schedules, reassignment

4   to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment

5   or modifications of examinations, training materials or policies, the provision of qualified readers

6   or interpreters, and other similar accommodations.  42 U.S.C. § 12111(9).  Bates v. UPS, 511 F.3d

7   974 (9th Cir. 2007).  In order for an accommodation to be "reasonable," it must be effective in

8   enabling the employee to perform his job duties.  UPS Supply, 620 F.3d at 1110; Humphrey v.

9   Mem'l Hosps. Assn., 239 F.3d 1128, 1137 (9th Cir. 2001).  Once an employee requests an

10  accommodation, "the employer must engage in an interactive process with the employee to

11  determine the appropriate reasonable accommodation."  UPS Supply, 620 F.3d at 1110; Zivkovic

12  v. Southern Cal. Edison Co., 302 F.3d 1080, 1089 (9th Cir. 2002).  This interactive process

13  requires: "(1) direct communication between the employer and employee to explore in good faith

14  the possible accommodations; (2) consideration of the employee's request; and (3) offering an

15  accommodation that is reasonable and effective."  UPS Supply, 620 F.3d at 1110-11; Zivkovic,

16  302 F.3d at 1089.  If a defendant fails to engage in an interactive process, "summary judgment is

17  available only if a reasonable finder of fact must conclude that there would in any event have been

18  no reasonable accommodation."  Dark v. Curry Cnty., 451 F.3d 1078, 1088 (9th Cir. 2006).  An

19  employer who fails to engage in the interactive process in good faith faces "liability for the

20  remedies imposed by the statute if a reasonable accommodation would have been possible."

21  Humphrey, 239 F.3d at 1137-38; Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1116 (9th Cir. 2000) (en

22  banc);[3] EEOC v. Creative Networks, LLC, 912 F.Supp.2d 828, 837 (D. Ariz. 2012).  Further, the

23  "duty to accommodate is a continuing duty that is not exhausted by one effort."  UPS Supply, 620

24  F.3d at 1111; Humphrey, 239 F.3d at 1138.  An employer must continue to engage in an

25  interactive process when the employee requests a different accommodation or where the employer

26  knows that an accommodation is failing and further accommodation is needed.  UPS Supply, 620

27  F.3d at 1111; Humphrey, 239 F.3d at 1138.

28

---

[3] Vacated on other grounds by U.S. Airways, Inc. v. Barnett, 535 U.S. 391 (2002).

10

1    *Discussion*

2        Union Pacific has raised four separate bases for summary judgment on Weeks's ADA

3    claim.  The Court will address each basis separately.

4        1.    Positions Available Between July 2012 and October 2013[4]

5        Union Pacific has presented evidence that the only non-union vacancies in California

6    between July 2012 and October 2013 were management level positions, which would be

7    considered a promotion.  However, the ADA creates no obligation for an employer to "promote"

8    an employee as a "reasonable accommodation."  See Duvall v. Georgia-Pacific Consumer Prods.,

9    L.P., 607 F.3d 1255, 1261 (10th Cir. 2010); McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d

10    92, 98-99 (2d Cir. 2009).  Therefore, none of the positions identified by Union Pacific would

11    constitute a "reasonable accommodation" for Weeks.[5]  Nevertheless, that the positions identified

12    by Union Pacific would not have been "reasonable accommodations" is not dispositive.

13        First, there is no evidence that explains why a review of available jobs should be limited to

14    only California.  Between 2005 and 2008, Weeks applied for over 30 different positions within

15    Union Pacific, none of which were in California.  See Doc. No. 42 at 6:21-24.  Moreover, Weeks

16    had been actively attempting to obtain a transfer to Nevada from July 2012 to early 2014.  See id.

17    at 7:17-8:12.  This evidence shows that Weeks was willing to take a position outside of California.

18    Given Weeks's willingness to move out of state, a review of available positions should not be

19    limited to only those in California.

20        Second, the evidence is limited to non-union positions.  See Roybal Dec. ¶ 2; Doc. No. 54-

21    1 at 5:25-27, 7:15-16.  There is no evidence regarding union positions that were available in

22    California, or any other location within Union Pacific's organization.

23        Third, Weeks has alleged that Union Pacific did not engage in an interactive process and

24    did not reasonably accommodate him.  The duty to reasonably accommodate is an on-going duty.

25

26    [4] This time frame is derived from the time in which Weeks filed his lawsuit (October 2013) and the applicable statute of limitations (pre-July 2012 claims are time barred, see Doc. No. 43).

27

28    [5] The allegation that Arnish and Union Pacific did not permit or make arrangements for Weeks to take the OMB Test is troubling.  However, because the ADA does not obligate an employer to promote, Arnish's actions do not implicate an ADA claim based on the failure to reasonably accommodate.

1    See UPS Supply, 620 F.3d at 1111; Humphry, 239 F.3d at 1138.  There is no evidence that Union

2    Pacific has ever engaged in an interactive process with Weeks.  See Doc. No. 43 at 19:12-20:16,

3    30:4-20.  Given these considerations, it is unclear why the time frame for a failure to

4    accommodate claim should end at the time Plaintiff filed this lawsuit.  The time frame used by

5    Union Pacific for examining available positions appears to be too limited.

6         Therefore, Union Pacific has only shown that a particular category of jobs, within a

7    particular state, during a particular time frame, were open but unavailable to Weeks because they

8    would constitute a "promotion."  Nevertheless, without evidence that speaks to other categories of

9    jobs, at other locations, during a broader time frame, Union Pacific's evidence is too limited and

10   does not demonstrate that no positions were available to Weeks.

11             2.    Loss Of Seniority For Transfers Outside Of Zone

12        Union Pacific contends that an inter-Zone transfer is not an option because Weeks would

13   lose his seniority, which he is unwilling to do.  There is no doubt that Weeks did not utilize an

14   "Intradistrict Transfer" procedure because he did not want to lose his seniority.  See Doc. No. 42

15   at 7:22-23.  However, as discussed above, the evidence indicates that in March 2015, engineers

16   Baker and Green successfully transferred from Bakersfield in Zone 2 to Roseville in Zone 1 and

17   kept their seniority.  See Foley Reply Dec. ¶ 14; Hood Dec. ¶ 2.  This shows that employees can

18   transfer between zones and retain seniority.  Thus, the question becomes, how can Baker and

19   Green transfer between Zones and keep their seniority, but Weeks cannot?

20        As discussed above, Union Pacific answers this question by explaining that there are two

21   types of seniority:  prior rights seniority and common rights seniority.  All engineers have

22   "common rights seniority," but only those who were hired or promoted as engineers after

23   September 1, 1997, have "prior rights seniority."  When an employee transfers between Zones, the

24   employee retains all "common rights seniority."  However, if the employee has "prior rights

25   seniority," he loses any "prior rights seniority" during the transfer.  The effect of this appears to be

26   that any employee who is already in the new Zone and who has "prior rights seniority" will always

27   be able to outbid the employee who has transferred into the new Zone.  Union Pacific explains that

28   Baker and Green did not have prior rights seniority, but did have common rights seniority that

they retained during the transfer.  See Foley Reply Dec. ¶¶ 9, 14.  Union Pacific argues that Weeks

is not comparable to Baker and Green because Weeks had "prior rights seniority."

      Based on the evidence presented, Union Pacific's argument is infirm.  Weeks has declared

that he had no "prior rights seniority."  See Weeks Sur-Reply Dec. ¶¶ 1, 2.  This is supported by

the portion of the RHIA that indicates that new engineers hired or promoted after September 1,

1997 would not have "prior rights."  See Foley Reply Dec. Ex. 1 at § II(B)(6).  Union Pacific has

not responded to Weeks's declaration or explained how Weeks has "prior rights seniority," given

that he became an engineer in 1999.[6]  Thus, the distinction urged by Union Pacific is not apparent

and is not controlling.  Moreover, Weeks declares that the type of transfer that Baker and Green

obtained was the type of transfer that he wanted, and that he had more seniority than Baker and

Green.  The transfer was accomplished without BLE involvement, and Baker and Green retained

at least their "common rights seniority."  Weeks's declaration, combined with Baker and Green's

circumstances, demonstrate that it is possible to transfer between Zones without losing all

seniority.  Therefore, Union Pacific's argument is not persuasive.

      3.    Standing Bid Applications

      Union Pacific argues that it has had in place since 2004 a "standing bid" processes,

whereby an employee simply places his name for any open position that may arise in a particular

location.  However, this is not really an argument.  It is simply a fact that demonstrates the

existence of a mechanism that could conceivably help an employee transfer to a different position.

The fact has little significance without evidence that Weeks knew about the system, that Weeks

was encouraged to use the system by someone at Union Pacific, or that someone at Union Pacific

otherwise attempted to help Weeks utilize the system to obtain a transfer.  Further, even if Weeks

was aware of this system, it is not apparent how the system could legitimately be characterized as

a "reasonable accommodation."  Nothing about the system would constitute any kind of

"adjustment" or "modification" that would enable Weeks to perform his job, nor is the "standing

bid" process an actual reassignment to an open position.  In the context of a failure to

accommodate claim, the mere fact that Union Pacific has a "standing bid system" is not probative.

[6] This is well after September 1, 1997 and February 24, 1998.  Cf. Foley Dec. ¶¶ 4, 6 & Ex. 1 at § II(B)(5).

1         <u>4.</u>    <u>Modified Work Schedule</u>

2         Union Pacific argues that Weeks has received one of his requested accommodations (a

3  modified work schedule) because Union Pacific's leave system permits an employee to lay off for

4  disability or medical leave act reasons without penalty.  It is true that Union Pacific's

5  representations indicate that it did accommodate Weeks to some degree.  However, this evidence

6  is not sufficient for summary judgment.

7         First, there is no evidence of an express understanding between Union Pacific and Weeks

8  in terms of a formal "reasonable accommodation."  Although Union Pacific's general leave system

9  as described sounds like it could accommodate Weeks, the evidence indicates that in practice, it

10  does not.  Union Pacific is aware of Weeks's pulmonary condition and the effects that it has on

11  Weeks.  <u>See</u> Weeks Opp. Dec. (Doc. No. 33-5) ¶¶ 4, 9, 10.  Despite this knowledge, Weeks has

12  been investigated on multiple occasions for taking time off related to his pulmonary condition.

13  <u>See</u> Doc. No. 43 at 9:2-21.  In fact, Weeks was formally disciplined for missing work in March

14  2015.  <u>See</u> <u>id.</u> at 10:1-5.  Weeks's latest declaration indicates that, even though his doctor has

15  cleared him to return to work, Union Pacific has not permitted him to return.  <u>See</u> Weeks Sur-

16  Reply Dec. ¶¶ 7, 8.  The time Weeks has missed, and the bases for the various investigations and

17  the March 2015 discipline, appear to be due to his pulmonary condition.  <u>See</u> Weeks Opp. Dec. ¶¶

18  15; Doc. No. 43 at pp. 9-10, 16-17.  Accepting Weeks's representations and viewing the evidence

19  in the light most favorable to Weeks, <u>see</u> <u>Narayan</u>, 616 F.3d at 899, the evidence indicates that

20  Union Pacific is not honoring any understanding it may have with Weeks or that its general leave

21  system (as described in this motion) is not being applied to Weeks because he has experienced

22  negative consequences from missing work due to his pulmonary condition.[7]

23

24  _____
[7] In the prior summary judgment order, the Court held that the notices of investigation were not "adverse employment
25  actions" for purpose of the ADA.  <u>See</u> Doc. No. 43 at 16:2-23.  The Court also held that, at that time, insufficient
evidence had been presented to show that the March 2015 discipline was an "adverse employment action."  <u>See</u> <u>id.</u> at
26  17:26-28.  However, that particular conduct may not be an "adverse employment action" does not mean that the
conduct has no significance.  Union Pacific was aware of Weeks's permanent pulmonary condition.  It appears the
27  investigations were a concern to Weeks, and they caused him to have to submit documentation and prepare for
hearings.  At a minimum, the notices of investigation could have the effect of impeding Weeks from laying-off or
28  utilizing the accommodation.  Further, the March 2015 notice of discipline is some form of discipline, and thus, some
form of penalty.  If the absences due to his pulmonary condition were not to count against Weeks, <u>see</u> DUMF 90, then
it is unclear why these investigations or the March 2015 discipline occurred.

Second, the evidence suggests that the modified work schedule may not be an effective accommodation.  The accommodation is ineffective either because the health consequences on Weeks are too severe, or because Union Pacific refuses to properly implement the accommodation in good faith.  In either case, this accommodation seems ineffective.  When it is apparent that an accommodation is ineffective, that is not the end of the process.  See UPS Supply, 620 F.3d at 1111; Humphrey, 239 F.3d at 1137-38.  The employer and employee are required to engage in a further interactive process in order to attempt to find another reasonable accommodation or to modify the existing accommodation.  See id.  That has not occurred in this case.  Union Pacific's reliance on one seemingly ineffective accommodation is improper.  See id.

    5.    Conclusion

There is no evidence that Union Pacific engaged in an interactive process, despite Weeks's many attempts to obtain an accommodation.  As a consequence, Union Pacific can obtain summary judgment on Weeks's ADA claim only by showing that no reasonable accommodation was available.  See Dark, 451 F.3d at 1088.  Union Pacific has failed to do so.  First, Union Pacific's evidence regarding other available positions is too limited to meet its summary judgment burden.  Second, the latest evidence from Foley, Hood, and Weeks shows that transfers between Zones and seniority are different and more nuanced than what was described in the prior summary judgment briefing.  The processes and consequences involved are no longer clear to the Court.  What is clear, however, is that the general statement that Weeks would "lose his seniority" in an inter-Zone transfer is not entirely true, which means that a transfer between Zones could be a reasonable accommodation.[8]  Third, the fact that a "standing bid" system is in place is not itself a reasonable accommodation.  Finally, it does not appear that Union Pacific is adhering to any "modified work schedule" accommodation, nor did it take steps to see if an additional accommodation or modification was possible.  Because Unions Pacific has failed to show that no accommodation was available to Weeks, summary judgment will be denied.

---

[8] It possible that there is a misunderstanding between the parties regarding transfers with or without seniority, or at least certain types of seniority.  If that is the case, the situation underscores the importance of an employer and an employee engaging in a legitimate interactive process.

1   **II.     FEHA § 12940(m) – Failure To Accommodate**

2          FEHA prohibits an employer from failing "to make reasonable accommodation for the

3   known physical or mental disability of an . . . employee." Cal. Gov. Code § 12940(m).

4   "Reasonable accommodation" means "a modification or adjustment to the workplace that enables

5   the employee to perform the essential functions of the job held or desired." Lui v. City & County

6   of San Francisco, 211 Cal.App.4th 962, 971 (2012).  An employer cannot prevail on summary

7   judgment on a claim of failure to reasonably accommodate unless it establishes through

8   undisputed facts that:  (1) reasonable accommodation was offered and refused; (2) there simply

9   was no vacant position within the employer's organization for which the disabled employee was

10  qualified and which the disabled employee was capable of performing with or without

11  accommodation; or (3) the employer did everything in its power to find a reasonable

12  accommodation, but the informal interactive process broke down because the employee failed to

13  engage in discussions in good faith.  Department of Fair Hous. & Empl. v. Lucent Techs., 642

14  F.3d 728, 744 (9th Cir. 2011); Jensen v. Wells Fargo Bank, 85 Cal. App. 4th 245, 263 (2000).

15         Here, the parties make the same arguments with respect to FEHA § 12940(m) as they did

16  with respect to Weeks's ADA discrimination/accommodation claim.  In FEHA failure to

17  accommodate cases, California courts often look to federal ADA cases for instruction.  See Raine

18  v. City of Burbank, 135 Cal.App.4th 1215, 1224-26 (2006).  Therefore, for the same reasons that

19  summary judgment will be denied as to the ADA accommodation claim, summary judgment will

20  also be denied as to the FEHA § 12940(m) claim.  See id.

21

22  **V.     Gov. Code § 12940(n) – Failure To Engage In An Interactive Process**

23         *Defendant's Argument*

24         Union Pacific argues that Weeks's interactive process claims should be summarily

25  adjudicated.  Once there has been an opportunity for full discovery, it is the Plaintiff's burden to

26  identify an available accommodation.  In Weeks's written discovery, he stated that he wanted a

27  job that was off of the trains or a transfer to a new location with better air quality.  When asked to

28  identify each position, Weeks responded only by attaching a list of positions that he had applied

1  for through 2008.  However, these positions fell outside the applicable limitations period.  Weeks

2  also identified a modified work schedule.  As already has been explained, Union Pacific provides

3  the modified work schedule that Weeks wanted.  Union Pacific does not penalize employees for

4  laying-off due to serious health conditions or disability.

5      *Plaintiff's Opposition*

6      Weeks's argument is essentially the same as those made with respect to the failure to

7  accommodate claim.  Additional discovery is needed in light of Union Pacific's evidence.

8      *Legal Standard*

9      Under FEHA, it is an unlawful employment practice to "fail to engage in a timely, good

10  faith, interactive process with the employee or applicant to determine effective reasonable

11  accommodations, if any, in response to a request for reasonable accommodation by an employee

12  or applicant with a known physical or mental disability or known medical condition."  Cal. Gov.

13  Code § 12940(n).  "The 'interactive process' required by the FEHA is an informal process with

14  the employee or the employee's representative, to attempt to identify a reasonable accommodation

15  that will enable the employee to perform the job effectively.  Ritualized discussions are not

16  necessary."  Scotch, 173 Cal.App.4th at 1013; see Nadaf-Rahrov v. Neiman Marcus Group, Inc.,

17  166 Cal.App.4t h 952, 984-85 (2008).  "Although it is the employee's burden to initiate the

18  process, no magic words are necessary, and the obligation arises once the employer becomes

19  aware of the need to consider an accommodation."  Scotch, 173 Cal.App.4th at 1013.  Once there

20  has been an opportunity to conduct discovery on the issue, a § 12940(n) plaintiff "must identify a

21  reasonable accommodation that would have been available at the time the interactive process

22  should have occurred."  Nealy v. City of Santa Monica, 234 Cal.App.4th 359, 379 (2015); Scotch,

23  173 Cal.App.4th at 1018.

24      *Discussion*

25      The Court is not convinced that a modified schedule has actually been agreed to or utilized.

26  As discussed above, there does not appear to have been any formal understanding between Union

27  Pacific and Weeks regarding the nature of a modified schedule or the frequency with which

28  Weeks could take time off.  Further, although Union Pacific indicates that it already has a policy

1    in place that would accommodate Weeks, the evidence presented does not indicate that the policy

2    is actually being followed in Weeks's case.  A number of investigations, one express form of

3    discipline, and a refusal to permit Weeks to return to work all appear to have resulted from Weeks

4    missing time due to his pulmonary condition.  This is contrary to a leave policy that does not

5    "penalize" an employee for missing time due to disability or serious health condition.[9]

6            Additionally, the evidence shows that there were engineer positions available in Roseville.

7    The declarations of Hood and Weeks show that Roseville had better air quality than Bakersfield,

8    had no tunnels (which exacerbate Weeks's condition), and would have been an acceptable

9    accommodation to Weeks.  Weeks had more "common rights seniority" than either Baker or

10   Green, and the type of transfer they obtained by these engineers was the type of transfer that

11   Weeks wanted.  There is no apparent reason why a Roseville position would not have been a

12   reasonable accommodation for Weeks.  It is true that Baker and Green's transfer to Roseville

13   occurred in March 2015, which is after the close of discovery and the deadline for filing

14   amendments.  However, the duties to accommodate and engage in an interactive process are

15   continuing, see Humphrey, 239 F.3d at 1137-38; Scotch, 173 Cal.App.4th at 1013-14, and there is

16   insufficient evidence that Union Pacific has ever engaged in any interactive processes.  Therefore,

17   the Roseville positions also demonstrate that reasonable accommodation was possible.

18           Because the evidence presented at this time indicates that there are/were at least two

19   accommodations available, summary judgment on this claim will be denied.

20

21   **IV.     Further Proceedings**

22           This matter will be referred back to the Magistrate Judge for the purpose of entering a new

23   scheduling order.  As part of the new scheduling order, discovery will be reopened and a new

24   discovery deadline set.

25           The Court finds it advisable to reopen discovery for several reasons.  First, Weeks's prior

26

27   [9] As discussed above, a modified work schedule may not be an effective accommodation for two reasons:  (1) it is too great a strain on Weeks's health; or (2) Union Pacific is not acting in good faith or is no properly implementing the accommodation /its policy.  It is unclear which of these scenarios applies.  Because this is summary judgment, the Court will assume that the later scenario applies.  So assuming, a modified work schedule could still be a reasonable accommodation because all that would be required is for Union Pacific to act in good faith.

28

counsel (who is now deceased) suffered from serious medical problems that affected his ability to prosecute this case. <u>See</u> Parker Opposition Dec. ¶ 6. Weeks's current counsel suffers from no such problems, and she declares that further discovery and depositions are needed to address summary judgment issues and to properly prosecute this case.[10] <u>See</u> <u>id.</u> at ¶¶ 4, 6-7. Second, significant events occurred around March 2015, well after the close of discovery. Weeks was disciplined for absences allegedly caused by his pulmonary condition, and two engineers with less "seniority" than Weeks were transferred by Union Pacific (without BLE involvement) to an area that would have accommodated Weeks. Third, the new evidence submitted has muddied the waters regarding transfers and seniority. It is unclear precisely what types of seniority Union Pacific recognizes, as well as what the parties mean when they use/used the bare term "seniority." The possible methods of transferring within and between Zones, along with the transfer's implications for all types of seniority, are also unclear. Given these considerations, the parties will be permitted to conduct discovery regarding transfers, seniority, and any other issues relevant to Weeks's remaining claims, including the events of March 2015.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. Defendant's second motion for summary judgment (Doc. No. 54) is DENIED;

2. The parties shall contact the Magistrate Judge within seven (7) days of service of this order for the purpose of entering a new scheduling order, as discussed above.

IT IS SO ORDERED.

Dated:   April 20, 2016

_____
SENIOR  DISTRICT  JUDGE

---

[10] An attorney's illness or medical condition can form the basis for modifying discovery schedules and deadlines. <u>E.g.</u> Continental Cas. Co. v. Dominick D'Andrea, Inc., 150 F.3d 245, 247 (3d Cir. 1998); <u>Morris v. State Bar of Cal.</u>, 2010 U.S. Dist. LEXIS 100455, *7 (E.D. Cal. Sept. 13, 2010). However, as the agent of his client, an attorney's acts generally bind his client, even if those acts are negligent. <u>See</u> <u>Towery v. Ryan</u>, 673 F.3d 933, 941 (9th Cir. 2012). Weeks's prior counsel never moved to withdraw and allowed the discovery deadline to lapse without conducting depositions. Because other later occurring events strongly favor reopening discovery, the Court need not determine whether the medical condition of Weeks's prior counsel alone would justify reopening discovery.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28